[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1161 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1162 
OPINION
Tina G. appeals a judgment of the juvenile court terminating her parental rights under Welfare and Institutions Code[1]
section 366.26 as to her minor daughter Tabatha G. Tina contends the court erred in (1) failing to apply a "best interests" exception to terminating her parental rights based on Tabatha's relationship with her grandmother and (2) ordering the discovery of a bonding study between Tabatha and Tina in violation of the attorney work product doctrine and the psychotherapist-patient privilege. We affirm.
 FACTUAL AND PROCEDURAL BACKGROUND
The circumstances of Tabatha's history as a dependent child of the juvenile court and Tina's involvement with San Diego County Department of Social Services (Department) are set forth in detail in two unpublished opinions from this court in prior appeals, Tina G. v. Superior Court (Jan. 7, 1993) D017092 (nonpub. opn.) and In re Tabatha G. (Sept. 18, 1995) D021804 (nonpub. opn.). For purposes of this appeal, we have taken judicial notice of the records in those cases. Accordingly, we limit our recitation of the facts and procedure to matters relevant to the court's findings and order at the selection and implementation hearing whereby Tina's parental rights were terminated.
The evidence at the selection and implementation hearing showed Tabatha had been in her current foster placement since September 14, 1990, when she was nine days old. The foster parents provided excellent care for Tabatha and wished to adopt her. Tabatha was obviously attached to them and called them mommy and daddy. Due to her age, ethnicity, good health and normal *Page 1163 
development, Tabatha was considered adoptable. Tabatha referred to Tina by her first name. She was not excited to see Tina nor was she sad when visits were over. Tabatha was not spontaneously affectionate toward Tina and did not go to her for comfort or attention. Tina did not engage Tabatha in play. The relationship did not appear to be that of parent and child but rather one of acquaintances and was not beneficial to Tabatha. The social worker believed it would not be detrimental to Tabatha to terminate parental rights in that Tabatha would not be deprived of any substantial, positive, emotional attachment to Tina.
The current visitation order allowed Tina to be present at visits between Tabatha and the maternal grandmother if the grandmother supervised them. When she arrived at visits, Tabatha would say hello to the grandmother and would always hug her goodbye. In the past year, Tina had not regularly visited with Tabatha. In the past few months, Tina visited Tabatha once and told the social worker it would probably be her last visit.
According to Anne F., Tabatha's foster mother, Tabatha was reluctant to visit with Tina. Even when the visits were supervised, Tabatha stated she did not want to go and she began to cling to her foster parents whenever they left the house. Since Tina stopped visiting, Tabatha never asked for her.
Yanon Volcani, Ph.D., conducted a bonding study of Tabatha and Tina. In Dr. Volcani's opinion, there was no significant relationship, bond or attachment between Tabatha and Tina. He also believed there would be no short-term effect on Tabatha if she no longer had contact with Tina.
Tabatha's maternal grandmother, Frances K., testified Tina originally visited Tabatha twice a week. In December 1991, visits between Tabatha and Tina were terminated but Frances continued to visit Tabatha. In April or May 1992, Tina was again allowed to visit Tabatha with Frances supervising. Frances testified Tina attended about three-fourths of those visits. Toward the end of 1993, Frances noticed a closeness between Tina and Tabatha that remained until Tina stopped visiting. During that time, Frances saw Tabatha give Tina a hug and kiss when she came for visits. When the visits ended, Tabatha said goodbye and asked who was going to be at the next visit.
After considering the evidence and hearing argument of counsel, the court found by clear and convincing evidence Tabatha was adoptable and none of the exceptions of section 366.26, subdivision (c)(1) applied to make termination of parental rights detrimental to Tabatha. The court terminated Tina's parental rights and referred Tabatha for adoptive placement. *Page 1164 
 DISCUSSION I (1) At a hearing under section 366.26, the court is required to select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (In re Edward R.
(1993) 12 Cal.App.4th 116, 122 [15 Cal.Rptr.2d 308]; In reHeather B. (1992) 9 Cal.App.4th 535, 546 [11 Cal.Rptr.2d 891] .) In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) The parent then has the burden to show termination would be detrimental to the minor under one of four specified exceptions. (§ 366.26, subd. (c)(1)(A), (D).) In the absence of evidence termination would be detrimental to the minor under one of these exceptions, the court "shall terminate parental rights. . . ." (§ 366.26, subd. (c)(1), italics added; see also In re Matthew C. (1993)6 Cal.4th 386, 392 [24 Cal.Rptr.2d 765, 862 P.2d 765] [where minor adoptable and none of the four statutory exceptions would result in detriment to minor, decision to terminate parental rights will be relatively automatic].)
(2) Tina concedes Tabatha is adoptable and does not contend any of the four exceptions of section 366.26, subdivision (c)(1) apply to make termination of parental rights detrimental to Tabatha. Rather, she argues a "best interests" exception applies to the selection and implementation of adoption as a minor's permanent plan under section 366.26, subdivision (c)(4). Based on Tabatha's relationship with her grandmother and the importance of maintaining that relationship, Tina asserts the court should have ordered a permanent plan of guardianship or long-term foster care instead of terminating her parental rights. We disagree.
In enacting section 366.26, subdivision (c)(1), the Legislature intended there be only four exceptions to selecting and implementing adoption as a permanent plan for an adoptable child. (See Sen. Select Com. Rep. on Children and Youth, Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (1988) pp. 11, 12; In re Jennifer J. (1992)8 Cal.App.4th 1080, 1090 [10 Cal.Rptr.2d 813].) At the time of a selection and implementation hearing, ". . . there is no window of evidentiary opportunity for a parent to show that in some general way the `interests' of the child will be fostered by an order based on some consideration not set forth in section 366.26." (In re Jennifer J., supra, 8 Cal.App.4th at p. 1090.) Nor did the Legislature provide an opportunity for a parent to show in a specific way that the child's best interests would be served by considerations beyond those enumerated in subdivisions (c)(1)(A) through (D). *Page 1165 
Tina's reliance on the language of section 366.26, subdivision (c)(4) to support her argument is unavailing. That subdivision provides: "If the court finds that adoption of the minor or termination of parental rights is not in the interests of the minor, or that one of the conditions in subparagraph (A), (B), (C), or (D), of paragraph (1) or in paragraph (2) applies, the court shall either order that the present caretakers or other appropriate persons shall become legal guardians of the minor or order that the minor remain in long-term foster care." (§ 366.26, subd. (c)(4).) From this language, we discern no legislative intent to create a broader exception not included in those expressly circumscribed. Indeed, had the Legislature meant to create a fifth "best interests" exception, it would have done so in a subparagraph of subdivision (c)(1).
The reference to "the interests of the minor" in section 366.26, subdivision (c)(4) is not a concept separate and distinct from that inherent in the statutory scheme created by the Legislature in all juvenile court actions. (See, e.g., § 202, subd. (b).) Moreover, consideration of the child's best interests is inherent in the legislative procedure for selecting and implementing a permanent plan. The four specified exceptions to adoption provided in section 366.26, subdivision (c)(1) are a final check to ensure termination of parental rights is in the best interests of the minor and is the least detrimental alternative. In this regard, the Legislature recognized that in certain specific instances, a plan other than adoption may be appropriate and less detrimental to the rights of both parent and child. (In re Laura H. (1992) 8 Cal.App.4th 1689, 1696-1697
[11 Cal.Rptr.2d 285].) Preserving the child's relationships with relatives other than a parent was not one of those instances. Having made the necessary findings under the statutory scheme to terminate Tina's parental rights, the court was not required to further consider whether Tabatha's best interests would be better served by a permanent plan of guardianship or long-term foster care. Tabatha, who is now five and one-half years old, deserves to have her custody status finally resolved and her placement made permanent and secure.[2]
 II
Tina contends the court erred in ordering the discovery of Dr. Volcani's bonding study between Tabatha and Tina and admitting it in evidence. She asserts both the attorney work-product rule and the psychotherapist-patient privilege precluded Department from obtaining the study. *Page 1166 
 A. Background
While Tabatha was on an unsupervised visit with Frances, Tina's counsel arranged for Dr. Volcani to conduct a bonding study between Tabatha and Tina and between Tabatha and Frances. This was accomplished without the knowledge of Department or the foster parents. When this came to its attention, Department sought discovery of the study. After expressing its disappointment that the study had been obtained in this manner, the court ordered Tina, Frances and their attorneys not to take Tabatha anywhere without a court order and under no circumstances were they to take Tabatha to a doctor or psychologist.
Tina opposed the discovery request on the grounds the bonding study constituted attorney work product and was also protected by the psychotherapist-patient privilege. At the hearing on the discovery motion,[3] the court found it was in Tabatha's best interest to release the bonding study to counsel and that the study did not come within the psychotherapist-patient privilege. The court further found it would be an injustice to Tabatha if the bonding study were not released.
 B. Attorney Work Product Doctrine
Juvenile courts are required to "control all proceedings with a view to the expeditious and effective ascertainment of the jurisdictional facts and of all information relevant to the present condition and welfare of the child." (Cal. Rules of Court,[4] rule 1412(a).) (3) Discovery in juvenile matters rests within the control of the juvenile court and the exercise of its discretion will be reversed on appeal only on a showing of a clear abuse. (Rule 1420; In re Jeanette H. (1990) 225 Cal.App.3d 25,31 [275 Cal.Rptr. 9].) The juvenile court rules encourage the informal exchange of information between the parties and create an affirmative duty to disclose favorable evidence, subject only to a showing of privilege or other good cause. (Rule 1420(a), (c), (e), (g), (h).) "The court is instructed under the rules to give substantial weight to the juvenile's need for stability and prompt resolution of custody status. [Citation.] The need for expeditious handling of juvenile matters is thus recognized and statutorily mandated. . . ." (In re Jeanette H., supra, 225 Cal.App.3d at p. 36.)
(4) Preliminarily, we question whether the legitimate purposes intended by the attorney work product doctrine would be served by allowing Tina's counsel to invoke that doctrine under the circumstances here. One of the *Page 1167 
policies of the attorney work product doctrine is "to prevent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc. § 2018, subd. (a)(2).) The bonding study was obtained on behalf of a child who was a dependent of the juvenile court (§ 360, subd. (d)), who had a guardian ad litem (§ 326), and who was represented by appointed counsel. (§ 317.) Despite knowing this, Tina's counsel arranged for Tabatha to be taken to Dr. Volcani's office without the knowledge or consent of the court, Department or Tabatha's counsel. Thus, the concept of "undue advantage" seems to apply more aptly to Tina's counsel in that her "industry and efforts" in obtaining the bonding study were less than aboveboard. Nevertheless, for purposes of our discussion, we treat the bonding study as attorney work product but conclude it was discoverable.
California's work product rule creates a qualified privilege against discovery of an attorney's general work product and an absolute privilege against discovery of an attorney's impressions, conclusions, opinions or legal theories. (Code Civ. Proc., § 2018) Where, as here, a qualified rather than absolute privilege applies, ". . . the work product of an attorney is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (Code Civ. Proc., § 2018, subd. (b).)
Here, the court found the bonding study was discoverable as being in Tabatha's best interests and because denial of its discovery would result in an injustice. One of Tina's positions at the selection and implementation hearing was that she had maintained contact with Tabatha, who would benefit from continuing that relationship. The purpose of the bonding study was to determine the extent of any bond or relationship between Tina and Tabatha and thus the contents of that study were relevant to contested issues at trial. Both Department and Tabatha's counsel were entitled to the information contained in the report in order to adequately evaluate their positions and present their sides of the case. Similarly, "in making the difficult decisions which it must make, a juvenile court can only benefit by having available to it all relevant information. . . ." (In re Rachael C. (1991) 235 Cal.App.3d 1445, 1452
[1 Cal.Rptr.2d 473].)
Further, precluding discovery of the bonding study under the circumstances here would have resulted in an injustice. (Code Civ. Proc., § 2018, subd. (b).) It was Tabatha who was the subject of the bonding study and certainly her counsel was entitled to that information in the first instance. Avoiding discovery of the bonding study by requiring Tabatha to undergo *Page 1168 
another one, as suggested by Tina, would have subjected Tabatha to unnecessary inconvenience and potential trauma, contrary to her best interests.[5] Equally important, the scheduling of another bonding study would have been time consuming and would have delayed the proceedings, in contravention of the Legislature's mandate for the expeditious handling of juvenile matters. (Cal. Rules of Court, rule 1412(a); In re Jeanette H.,supra, 225 Cal.App.3d at p. 36.) Thus, the court properly ordered the discovery of the bonding study.
 C. Psychotherapist-patient Privilege
Under Evidence Code section 1014, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication between a patient and a psychotherapist. (5) The privilege applies to discovery as well as trial and applies even if the information sought is relevant to a disputed issue unless waived or subject to a statutory exception. (Simek v. Superior Court (1981) 117 Cal.App.3d 169,173-174 [172 Cal.Rptr. 564].) Within the context of the psychotherapist-patient privilege, "patient" is defined as "a person who consults a psychotherapist or submits to an examination by a psychotherapist for the purpose of securing a diagnosis or preventative, palliative, or curative treatment of his mental or emotional condition or who submits to an examination of his mental or emotional condition for the purpose of scientific research on mental or emotional problems." (Evid. Code, § 1011.)
(6) Here, the purpose of the bonding study was to obtain evidence of the existence and nature of a relationship between Tina and Tabatha so that Tina could show termination of her parental rights was precluded by the exception of section 366.26, subdivision (c)(1)(A). In this regard, Tina was not a "patient" for purposes of the privilege because she was not seeking a diagnosis or treatment of a mental or emotional condition nor was any scientific research involved. (Evid. Code, § 1011; seePeople v. Cabral (1993) 12 Cal.App.4th 820, 826-828
[15 Cal.Rptr.2d 866] [privilege did not apply where defendant contacted psychotherapist not for treatment but to avoid prison sentence].) Thus, the court properly found the bonding study did not fall within the psychotherapist-patient privilege. *Page 1169 
 DISPOSITION
The judgment is affirmed.
Haller, J., and McDonald, J., concurred.
Appellant's petition for review by the Supreme Court was denied August 14, 1996.
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] Because no "best interests" exception to termination of parental rights exists, the court properly excluded evidence of Tabatha's relationship with her grandmother as irrelevant to the issues before it.
[3] Tabatha's counsel joined in the motion to compel discovery of the bonding study.
[4] All rule references are to the California Rules of Court.
[5] According to the social worker, Tabatha had been upset about the bonding study and said she did not like it. Tabatha's counsel objected to another bonding study, stating Tabatha had been "adversely affected" by the first one. *Page 1170