[No. B221562. Second Dist., Div. Eight. Sept. 2, 2010.]

In re JOSE C., A Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
D.C., Defendant and Respondent;
N.C., Intervener and Appellant;
JOSE C., Appellant.

150

---

**COUNSEL**

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Appellant Jose C.

Christopher Blake, under appointment by the Court of Appeal, for Intervener and Appellant N.C.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

OPINION

**GRIMES, J.—**

## SUMMARY

The child, Jose C., and the maternal grandfather in this dependency case challenge the juvenile court's order terminating the mother's parental rights. The order must be reversed, they say, because (1) the court erred in finding Jose was likely to be adopted, and (2) the court should have found the grandfather to be Jose's presumed father (even though the court was not asked to do so), a finding that would have allowed the grandfather to assert the "continuing beneficial relationship" exception to termination of parental rights. We find no merit in these contentions and affirm the order terminating parental rights and freeing Jose for adoption.

## FACTUAL AND PROCEDURAL BACKGROUND

Both Jose and his mother are developmentally delayed, and both receive assistance from government entities (referred to as regional centers) that provide services to developmentally disabled persons. Jose, who was then seven years old, first came to the attention of the Los Angeles County Department of Children and Family Services in November 2006, when it was alleged mother physically abused Jose. Because the family was receiving services from the regional center that included in-home supervision, the department did not remove Jose from the home. But, despite receiving intensive services, including 24-hour in-home supervision, parenting and anger management classes, mother made minimal progress and continued to use inappropriate physical discipline.

On June 14, 2007, after an incident in which it appeared that Jose had been hit in the eye, either by a pencil or his mother's hand, the department detained Jose. The juvenile court sustained the allegations that mother used inappropriate physical discipline and that mother was developmentally delayed and unable to provide appropriate care and supervision for Jose. (Welf. & Inst. Code, § 300, subds. (a) & (b).) The man whom mother identified as Jose's father had no contact with Jose, and the father's whereabouts are unknown. Jose was placed in foster care.

A long series of hearings ensued, including dispositional, six-month review, 12-month review, and permanency planning hearings. While mother was well intentioned, and strong bonds existed between Jose and mother (and between Jose and his maternal grandfather), mother was unable to learn to control her behavior. Her parental rights were terminated and Jose was freed

for adoption. Below, we summarize pertinent facts relating to mother, Jose, grandfather, and Jose's caretaker (the prospective adoptive mother).

1. *The mother*

Jose's mother has the cognitive ability of a five year old and functions socially at the level of an 11 year old. She lacks the capacity to learn anger management and appropriate parenting skills, and is unable to provide care for Jose without constant supervision.

In a court-ordered psychological evaluation, Dr. Daniel Kramon concluded that mother was well intentioned with Jose, but unable to control her inappropriate, impulsive statements to him (and that, with respect to hitting Jose, "this issue will likely be an ongoing struggle for her to control herself"). Kramon characterized the relationship between mother and son as "more similar to a peer type relationship than that of a mother/child relationship." While there were "many deficits" in the mother's parenting abilities, Kramon's August 13, 2007 report indicated that Jose appeared "very closely bonded with [mother] and if Jose were to be separated from her for an extended period of time, there could be a risk of significant emotional detriment."

The department's report in August 2007 also included its interviews with Dr. Mayra Mendez, a therapist who had treated mother for several years when mother was younger and who had begun treating her again about 15 months earlier. Mendez observed that, based on Jose's level of need and mother's level of retardation, the mother had "zero capacity" to handle Jose's multiple problems.[1]

2. *Mother's relationship with grandfather*

Jose and his mother lived with the maternal grandfather for the first six years of Jose's life, until October 2005, when mother moved out with Jose. Mother claimed that grandfather used to physically abuse her. The department asked Dr. Mendez about the relationship between mother and grandfather. Mendez reported that mother lived with grandfather until mother made allegations that he was physically abusing her and taking her money, "which according to Dr. Mendez, she [(mother)] not only reported to her [(Dr. Mendez)], but to regional center . . . ." According to the department's report, Dr. Mendez said that "if maternal grandfather is doing 'good' in mother's eyes, such as

---

[1] A guardian ad litem was appointed for mother (with her consent) in November 2008.

providing her with transportation, then mother is in good stance with him, otherwise, mother will not remain in contact with him."[2]

### 3. *The grandfather*

In March 2008, the department and grandfather discussed the possibility of placing Jose in grandfather's home. Grandfather reported he was staying in a friend's garage that did not have an indoor restroom or a room for Jose; such a home would likely not receive the necessary approval for placement of a dependent child. Grandfather told the department that he had a flexible schedule to care for Jose if Jose were placed with him; he owned a tow truck and worked side jobs as a mechanic, and could use respite care from the regional center for Jose when he needed to work. Grandfather also told the department that his daughter did not want Jose placed with him because she (mother) did not want to move in with him "as she likes her freedom." Grandfather elected not to have his home assessed for placement as he did not think it would be approved.

Grandfather sought de facto parent status on several occasions beginning in March 2008.[3] A de facto parent is someone who has assumed the role of a parent on a day-to-day basis for a substantial period; a de facto parent may be present at hearings concerning a dependent child, may be represented by retained counsel (or at the court's discretion, by appointed counsel), and may present evidence (*In re Patricia L.* (1992) 9 Cal.App.4th 61, 66 [11 Cal.Rptr.2d 631]), but does not have the rights of a parent. Finally, in July 2009, the court (over the department's opposition) granted grandfather's request for de facto parent status, observing that the request presented the court with "a very, very mixed bag" but that such motions were to be liberally construed.

### 4. *The prospective adoptive mother*

In August 2007, about seven weeks after he was detained, Jose was placed in the home of foster parent A.A., where he has remained throughout these

---

[2] In March 2008, mother told the department that she did not want to return to living with her father because "he only tries to control her," and " 'I don't like him telling me what time to get home and he is going to tell me not to have a boyfriend.' " Mother stated that "she refused for Jose to be placed with her father because '[h]e would be better off with her [(the foster mother)] than my dad. I don't want to see him [(Jose)] get hurt. He [(grandfather)] tells him bad things about me. My dad [(grandfather)] hit me too many times and in front of Jose.' "

[3] Grandfather's first request (which had not been served on anyone else) was denied on September 16, 2008, with the court observing that the request did not set forth sufficient evidence to support a finding of de facto parent status. The court received another request on November 4, 2008, but again the parties had not been served with copies. At the April 8, 2009 hearing, grandfather said he had filed a de facto parent petition, but again he failed to serve it on the other parties.

proceedings. (Jose was initially placed in another home, but the foster parent there "was overwhelmed with the behavioral problems that Jose was presenting with . . . .") A.A. wants to adopt Jose, who has thrived and adjusted well in her home.

When Jose was first placed with A.A., he was not toilet trained. By June 2008, A.A. reported that "Jose has [come] a long way and . . . he is able to go to the restroom on his own and is able to identify his needs." A.A. reported that Jose "continue[d] to improve at school as teachers report to her that [Jose] is doing better as he can recognize most letters, colors, and numbers." By July 2008, Jose reported that "I want [A.A.] to be my other mom. She helps me a lot." The department's April 2009 report indicated that Jose and A.A. had developed a strong attachment to each other, and Jose had also developed a strong bond with three of A.A.'s adult children with whom he had daily contact, and with her adopted son.

At a hearing in September 2008, mother's counsel told the court that mother was inclined to accept an adoption for Jose if it were an open adoption, though she needed to know the terms of such an arrangement. A.A. indicated she was also interested in ensuring that Jose and his mother maintain contact after an adoption, but preferred any postadoption contact to be monitored. A postadoption contact agreement was signed in February 2009, and included provisions for regular face-to-face and phone contact between mother and Jose.

The department's report in April 2009 stated A.A. believed it was important that Jose maintain a relationship with his birth mother. But A.A. and mother (according to the report) believed it would not be in Jose's best interest to continue having visits with his grandfather, "due to grandfather being aggressive towards mother and Jose in the past."

5. *Jose*

Jose has been diagnosed as having attention deficit hyperactivity disorder (for which he takes medications) and mild mental retardation. When he was detained, he was receiving therapeutic counseling services. Though he was almost eight years old, he did not use the toilet for bowel movements. Dr. Mendez, who had also treated Jose and supervised his previous therapist, said that he appeared to be functioning at the age of a three to four year old. Sonia Lopez began providing Jose with individual therapy in late August 2007. By March 2009, Jose had "decreased negative social interactions" and was able to make friends at school. By December 2009, Lopez had stopped meeting with Jose, because he was stable and no longer in need of individual therapeutic services.

Jose has a difficult time grasping the concept of adoption; when interviewed about adoption, he said that he likes living with A.A., and would like to continue to do so on a permanent basis if he cannot live with his mother.

6. *Visitation*

Mother has had weekly monitored visits with Jose throughout these proceedings. While she was not always consistent and sometimes cancelled visits, for the most part the visits occurred with regularity. Jose generally enjoyed his visits with his mother.

Grandfather also visited regularly with Jose throughout his dependency every Sunday. A.A. monitored the visits, which occurred at a local park near her home, and reported that Jose enjoyed spending time with his grandfather and looked forward to visiting him. Jose said, "[M]y grandpa is fun and brings me candy." (The department's Feb. 2008 report stated the visits were monitored "due to grandfather's abusive relationship with mother . . . .") The grandfather wanted more visiting time, but the foster mother could not accommodate more time in her schedule. The department's September 2008 report indicated that A.A. reported that, on a recent occasion, grandfather was trying to walk away and whisper to Jose, but after she informed him that he was not allowed to do that, subsequent visits were appropriate, and other than that, there was never a problem with grandfather's visits.

7. *The juvenile court proceedings*

On December 10, 2008, the court terminated reunification services, finding ample evidence that Jose could not be returned to his mother.

At the hearing for selection of a permanent plan for Jose, the department recommended termination of parental rights and adoption as the permanent plan. The department also reported it would be in Jose's best interest to continue to have monitored visits with mother in accordance with the postadoption contact agreement.

Various reports from the department were admitted into evidence without objection, and Jose's counsel sought to elicit evidence from Jose. Jose began crying uncontrollably, however, and all counsel stipulated that "he would testify that he loves his mother and his grandfather very much, that he calls his [grandfather] 'Dad,' and that he would like to live with his Dad," and that "he doesn't want to end the visits with either his mother or his maternal grandfather. In fact he would like more visits."

After the receipt of evidence, the juvenile court asked for briefing from all parties on the legal issues whether Jose was adoptable; if not, why not; and if

so, "what under [Welfare and Institutions Code section] 366.26 would be the legal or factual reasons that would compel the court not to terminate parental rights?" The court told the parties that "I would think that you're going to have to find some evidence with respect to how that relates to the grandfather's relationship and whether the grandfather or the law has any exceptional case law that really addresses that issue." The court then appointed counsel for grandfather.[4]

At a subsequent hearing, the court received briefs from the parties. The court observed that "one of the things that might resolve the case" was whether or not A.A. was willing or able to enter into a postadoption contact agreement and "whether grandfather could also participate in the visitation. I think that goes a long way toward resolving a number of issues." The court ordered the department to "re-refer the matter for a post-adoption contract for not just the mother but the grandfather" and to include mother's guardian ad litem in the discussions. The department's final report stated the parties were negotiating agreements, and A.A. believed it was important for Jose to maintain a relationship with his birth mother and grandfather, but no agreements had been finalized.

On January 7, 2010, the court issued its written decision, finding Jose was adoptable "both generally and/or specifically based upon the record before the court." In addition, the court concluded that the "continuing beneficial relationship" exception to termination of parental rights did not apply. The court addressed grandfather's relationship with the child and acknowledged the child's objection, through his attorney, to the termination of parental rights as well as his apparent father-son relationship with grandfather. The court concluded that it was in Jose's best interests to "be adopted in a safe and stable home with [A.A.]." The court continued: "The alternative are the [vagaries] of guardianship, false hope that either the mother or the grandfather could assume full time custody and the possibility that the current placement could be jeopardized and he could end up in foster care."

At the hearing, the court observed that it had been an exceedingly difficult case for the court to decide, but that from a legal standpoint, "it's not a difficult decision because the dependency scheme, the statute as written, the case law as written, I believe, compel the court to make the decision that I am making today." The court continued: "[E]ven though I note what is the bonded relationship or the relationship between Jose and his mother and Jose and his grandfather, I couldn't pound a square peg into the round hole as requested by the mother, grandfather, and minor's counsel. Because in sort of many respects, what I'm really being asked to do is two things: First, to

---

[4] The court also suggested that A.A. seek de facto parent status; she did so, and another judge granted her motion and appointed an attorney for her.

recognize what may be more of a sibling relationship between mother and child and the sibling exception, and in some manner try to recognize the grandfather as the father for purposes of the child/parent exception. I just cannot find anything in the law that allows me to do so. [¶] I am not the Legislature. I am not the Court of Appeal. . . . So although there is, certainly from an emotional standpoint, some weight to what minor's counsel and the grandparent and mother's counsel argued, I don't see how I can do what they're asking me to do on the facts."

Jose and his grandfather filed notices of appeal from the court's order terminating parental rights and freeing Jose for adoption, as did Jose's mother. Mother's appointed counsel filed a brief raising no issues, and this court subsequently dismissed mother's appeal as abandoned. (See *In re Sade C.* (1996) 13 Cal.4th 952 [55 Cal.Rptr.2d 771, 920 P.2d 716]; *In re Phoenix H.* (2009) 47 Cal.4th 835 [102 Cal.Rptr.3d 481, 220 P.3d 524].)

## DISCUSSION

The crux of Jose's (and grandfather's) argument against terminating parental rights is that Jose has strong attachments to his mother and grandfather, and the severing of these strong bonds by adoption will cause him grief and trauma. Because the trial court failed to consider the strength of these attachments and his age (they contend), the trial court erred in finding that he was likely to be adopted. The trial court further erred, they claim, in failing to find the grandfather was Jose's presumed father, a status that would have allowed grandfather to invoke the continuing beneficial relationship exception to the termination of parental rights.

We, like the juvenile court, recognize the existence of significant familial attachments between Jose and his mother and grandfather. But we can find no error in the trial court's orders. Nor can we find any evidence of the factual premises upon which Jose challenges those orders: that is, no evidence that the trial court did not consider the strength of Jose's familial bonds, and no evidence that Jose will be traumatized if his relationships with his family are severed. In short, we find no legal or factual basis for interfering with Jose's adoption.

1. *The trial court did not err in finding Jose was likely to be adopted.*

  a. *The legal principles*

A child who cannot be returned to his or her parent must be placed for adoption, in legal guardianship, or in long-term foster care. (Welf. & Inst. Code, § 366.26, subd. (b).) "Adoption, where possible, is the permanent plan

preferred by the Legislature. [Citation.] 'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' " (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573–574 [32 Cal.Rptr.2d 535].) "If the court determines, . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (Welf. & Inst. Code, § 366.26, subd. (c)(1).)

■ The issue of adoptability "focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].) And "[u]sually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor." (*Id.* at pp. 1649–1650.) In some cases, a minor "who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id.* at p. 1650.) And when a child is deemed adoptable "only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80 [57 Cal.Rptr.3d 914] (*Helen W.*).)

We review a finding of adoptability for substantial evidence (*In re R.C.* (2008) 169 Cal.App.4th 486, 491 [86 Cal.Rptr.3d 776]), and "[t]he appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Ibid.*)

b. *This case*

Jose does not even attempt to show a lack of evidence supporting the juvenile court's finding of adoptability. Instead, he contends that the "willingness of the child to accept and submit to an adoption" should be a factor in determining whether the child is likely to be adopted.[5] This claim is not based on any legal authority, and it is not based on any evidence. It is based solely on the speculation that, "once Jose clearly understands that adoption by the foster mother will mean the loss of his relationship with grandfather and

---

[5] A child aged 12 years or older must consent to his adoption. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(ii).) Jose, whose birthday is in July, is now 11 years old.

with his mother, he may well reject both the placement and the foster mother." Jose contends that he "may react . . . by regressing in his behaviors"; he "may become depressed" or he "may become angry, disobedient and violent"; he "may blame the foster mother for his loss and withdraw from all emotional attachment to her"; and he "may act out, . . . hoping to disrupt the placement."

We cannot interfere with the juvenile court's ruling based on speculation about what "may" happen. First, Jose's adoption may *not* result in "the loss of his relationship with grandfather and with his mother" because, when parental rights were terminated, the parties were in the process of negotiating a postadoption contact agreement.[6] Second, even if the adoption does result in the loss of those relationships, mere speculation about Jose's reaction is not evidence and cannot be considered in determining his adoptability.

The only evidence in this case fully supports Jose's adoptability: A.A. has cared for Jose for three years, during which he has thrived and has progressed from an eight year old who was not even toilet trained to a child (less than one year later) who is "able to go to the restroom on his own and is able to identify his needs." The department's report shows that, under A.A.'s care, Jose has progressed to the point where he has not had any behavioral issues in school and he no longer requires individual therapeutic services. A.A., who has provided foster care services to children since 1992, has developed a strong attachment to Jose, as has her family, and she has said that she wants to provide Jose with a permanent, safe, and loving home. A.A. understands the responsibilities of adoption. Jose likes living with A.A., has developed a very strong bond with A.A.'s adopted son, and has been "fully included and incorporated into [A.A.'s] family."

Under these circumstances, Jose has entirely failed to show any legal or factual basis that could undermine the trial court's finding of adoptability. As *Helen W.* tells us, when a child is deemed adoptable only because a particular caretaker is willing to adopt, we turn from an evaluation of the child's characteristics to analysis of "whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child."[7] (*Helen W., supra,* 150 Cal.App.4th at p. 80 ["[e]ven if the juvenile court had relied solely on the foster mother's willingness to

---

[6] We recognize that, even with a postadoption contact agreement, the adoptive mother could refuse contact with Jose's family, if she so chose, without jeopardizing the adoption. (See Fam. Code, § 8616.5, subd. (e)(1) [the agreement must contain a warning that "[a]fter the adoption petition has been granted by the court, the adoption cannot be set aside due to the failure of an adopting parent . . . to follow the terms" of the agreement].)

[7] The juvenile court rejected arguments from Jose and grandfather that Jose was neither generally nor specifically adoptable "due to his documented special needs," and found that Jose was "adoptable both generally and/or specifically based upon the record before the court."

adopt, the adoptability finding would be supported by clear and convincing evidence"].) As in *Helen W.*, no legal impediment exists, and the evidence of A.A.'s ability to meet Jose's needs was ample.[8]

2. *The juvenile court did not err in failing to consider "presumed father" status for grandfather.*

   a. *Background*

■ When a juvenile court finds it is likely the child will be adopted, the court is required to terminate parental rights unless a statutory exception exists. The court must terminate parental rights unless the court "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" specified circumstances—in this case, that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).) "[I]t is the parent's burden to show exceptional circumstances exist." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 574.)

*In re Autumn H.* construed the continuing beneficial relationship exception to mean that the parental relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) The juvenile court's obligation is to "balance[] the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

---

We see no reason to address whether Jose was "generally" adoptable. (See *In re Sarah M., supra*, 22 Cal.App.4th at p. 1650 ["a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family" (italics omitted)].)

[8] Jose insists that legal guardianship "would be for him the best [permanent plan] the system could provide." As we have seen, the evidence does not support that claim, and neither does the law. "A guardianship . . . is not a permanent situation because a child remains within the jurisdiction of the juvenile court." (*In re Xavier G.* (2007) 157 Cal.App.4th 208, 215 [68 Cal.Rptr.3d 478], citing Welf. & Inst. Code, § 366.4, subd. (a).) A guardianship "is subject to change" and does not provide "the same level of stability as adoption would provide." (*In re Xavier G., supra*, at p. 215; see also *Helen W., supra*, 150 Cal.App.4th at p. 80 ["[a]fter a child is found adoptable, the termination of parental rights and adoption is considered the best mechanism to ensure the child has 'a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child' "].)

Here, the juvenile court concluded that the benefit of continuing the relationship with mother did not outweigh the benefits of a permanent home. This was because the relationship between mother and child was in the nature of a peer relationship rather than a parent-child relationship, and, despite intensive services, mother could not retain information and continued to exhibit aggressive behavior and poor impulse control.[9] The court's conclusion was fully supported by Dr. Kramon's psychological evaluation and other evidence showing that the mother functioned at the social and intellectual levels of a child. The mother raised no arguable issue on this point in her appeal, and properly so.

### b. *Grandfather's claim*

This brings us to the grandfather's point, which is that if he were found to be Jose's presumed father, he could assert the continuing beneficial relationship exception to the termination of parental rights. And so he could, if he were, but he is not.

First, grandfather did not seek presumed father status in the juvenile court, and parties cannot assert error on appeal when they failed to raise the issue with the juvenile court. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 590 [30 Cal.Rptr.2d 575] ["[a]s a general rule, a party is precluded from urging on appeal any point not raised in the trial court"]; *In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 [207 Cal.Rptr. 728] ["[a] party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do . . ."].) To do so seems particularly inappropriate at this late stage of a dependency proceeding, when the focus is on the child's interest in stability and permanency.

Second, grandfather's claim would fail as a matter of law even if it had been raised below. In dependency cases, "fathers" are divided into several categories, including natural and presumed. (*In re A.A.* (2003) 114 Cal.App.4th 771, 779 [7 Cal.Rptr.3d 755].) A natural father is one who has been determined to be the child's biological father.[10] (*In re A.A.*, at p. 779.) " 'Presumed fatherhood, for purposes of dependency proceedings, denotes one who "promptly comes forward and demonstrates a full commitment to . . . paternal responsibilities—emotional, financial, and otherwise[.]" ' "

---

[9] Compare these circumstances with those in *In re S.B.* (2008) 164 Cal.App.4th 289, 300 [79 Cal.Rptr.3d 449] (reversing order terminating parental rights where the father "maintained a parental relationship" with the child, who derived "comfort, affection, love, stimulation and guidance" from her continued relationship with the father).

[10] The term "natural father" is used when biological paternity has been established, but the man " 'has not achieved presumed father status' " as defined by the Family Code. (*In re A.A., supra*, 114 Cal.App.4th at p. 779.)

(*Ibid.*) "A natural father can be a presumed father, but is not necessarily one; and a presumed father can be a natural father, but is not necessarily one." (*Ibid.*) A presumed father is entitled to reunification services and custody of the child. (*In re Jesusa V.* (2004) 32 Cal.4th 588, 610 [10 Cal.Rptr.3d 205, 85 P.3d 2].)

█ In dependency cases, a man may obtain presumed father status by meeting conditions described in Family Code section 7611. (*In re A.A., supra,* 114 Cal.App.4th at p. 780.) One of the conditions creating presumed father status—the one asserted by grandfather in this case—is that "[a] man who receives a child into his home and openly holds the child out as his natural child is presumed to be the natural father of the child."[11] (*In re Nicholas H.* (2002) 28 Cal.4th 56, 58, .[120 Cal.Rptr.2d 146, 46 P.3d 932], citing Fam. Code, § 7611, subd. (d).) A man claiming to be a presumed father has the burden of establishing two elements: " 'reception [of the minor] into [his] home and openly and publicly acknowledging paternity.' " (*In re A.A., supra,* at p. 782.)

Here, grandfather has not offered a scintilla of evidence that he can establish the second of the two elements necessary for presumed father status: " 'openly and publicly acknowledging paternity.' " (*In re A.A., supra,* 114 Cal.App.4th at p. 782.) Throughout their briefs, Jose and grandfather repeatedly assert that, for the first six years of Jose's life, grandfather acted as the functional equivalent of Jose's father. And no doubt he did, but that alone does not satisfy the test for presumed father status. Many people may perform the function of a parent at various points in a child's life, including grandparents, stepparents, foster parents, extended family members, and so on. Doing so does not make any of them a presumed parent. That status is defined by statute, and it includes openly holding out the child as one's natural child. (Fam. Code, § 7611, subd. (d).) Grandfather has never done so.

Grandfather argues that a biological relative can be a presumed parent, as demonstrated in *In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1359 [4 Cal.Rptr.3d 705] (*Salvador M.*), where the child's adult half sister was found to be the child's presumed mother.[12] Grandfather is correct, but the point is

---

[11] Other conditions creating presumed father status involve marriage to, or an attempt to marry, the child's natural mother during various time periods. (Fam. Code, § 7611, subds. (a)–(c).)

[12] Most decisions focus on the definition of the presumed father, but the same legal principles apply to a woman seeking presumed mother status. (*In re Salvador M., supra,* 111 Cal.App.4th at p. 1357; see also *In re Karen C.* (2002) 101 Cal.App.4th 932, 939–940 [124 Cal.Rptr.2d 677] [the presumption in Fam. Code, § 7611, subd. (d) applies equally to women; if the juvenile court credited uncontradicted testimony on the point, the woman in question, who was not the birth or genetic mother, "received [the child] into her home and openly held [the child] out as her natural child"].)

of no assistance to him, because *Salvador M.* turned upon the very point that grandfather cannot establish: the evidence that the adult half sister held the child out to the community as her son.[13] In *Salvador M.*, the child himself thought his sister was his mother (and that her other children were his siblings). (*Salvador M., supra*, at pp. 1356, 1358.) Here, Jose (and everyone else) knows he is not grandfather's son, and grandfather has never suggested to anyone that he is Jose's father.[14] Consequently, grandfather cannot qualify as a presumed father.

■ One final note. As the juvenile court recognized, there is no "best interests" exception to termination of parental rights. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165, fn. 2 [53 Cal.Rptr.2d 93].)[15] Nevertheless, the court acknowledged Jose's stated objection and his "apparent father-son relationship with the grandfather," and took those factors into account (along with Jose's statements that he enjoyed living with A.A., whom he calls "Mom"). The juvenile court concluded it was "in Jose's best interests that he be adopted in a safe and stable home with [A.A.]." On appellate review, "we

---

[13] In *Salvador M.*, the child's adult half sister (the appellant) treated the child as if he were her own son (both before and after their mother's death when the child was three years old). (*Salvador M., supra*, 111 Cal.App.4th at pp. 1355, 1359.) The child believed he was the appellant's son, and the only people who knew differently were family members and school officials to whom the appellant gave truthful information. She averred that " 'to the rest of the world, Salvador is my son.' " (*Id.* at p. 1356.) The court rejected the claim that the appellant's truthfulness with school officials, and police and social workers involved in her case, undermined her claim she held Salvador out as her son. The court reasoned that Salvador—by then eight years old—would not still believe the appellant was his mother unless she had told him and the world she was his mother. "[F]or Salvador to hold on to that belief for so long must mean that appellant held Salvador out to the community as her son." (*Id.* at p. 1358 ["appellant established herself as Salvador's presumed mother long before she was forced to truthfully admit her actual relationship to school officials"].)

[14] Even if grandfather had done so, he waited far too long to bring the matter up in a dependency proceeding. (See *In re Eric E.* (2006) 137 Cal.App.4th 252, 261 [39 Cal.Rptr.3d 894] [rejecting claim to presumed father status; "[a]lthough Gene provides evidence that when [the child] was born he assumed the role of father, there is no evidence of a change in circumstances from the time that [the child] was detained when Gene did not have custody of [the child] and did not assume the role of a parent"; Gene "identifie[d] no change in circumstance during the relevant dependency proceeding, in which he acknowledged that he was unable to care for [the child]. Once reunification is over, the court must focus on [the child's] interest in stability, not in Gene's interest in maintaining family ties."].)

[15] *In re Tabatha G.* explains that the specified exceptions to adoption in Welfare and Institutions Code section 366.26, subdivision (c)(1) "are a final check to ensure termination of parental rights is in the best interests of the minor and is the least detrimental alternative. In this regard, the Legislature recognized that in certain specific instances, a plan other than adoption may be appropriate and less detrimental to the rights of both parent and child. [Citation.] Preserving the child's relationships with relatives other than a parent was not one of those instances." (*In re Tabatha G., supra*, 45 Cal.App.4th at p. 1165 & fn. 2 [court "properly excluded evidence of [child's] relationship with her grandmother as irrelevant to the issues before it"].)

may not reweigh the evidence and substitute our judgment for that of the trial court." (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774 [109 Cal.Rptr.2d 123].)

## DISPOSITION

The order is affirmed.

Flier, Acting P. J., and O'Connell, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.