Filed 6/30/15  In re Tyy. D. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Tyy. D. et al., Persons Coming Under the Juvenile Court Law. | D067389 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ003555 A-B) |
| v. | |
| T.D. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant T.D.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant To. D.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patricia Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

T.D., the father, and To. D., the mother, appeal a judgment terminating their parental rights over their daughters, Tyy. D. and Tye. D. (together the girls), and selecting adoption as the preferred permanent plan. The parents challenge the sufficiency of the evidence to support the court's finding of adoptability.[1] We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2012, the San Diego County Health and Human Services Agency (Agency) filed petitions on behalf of three-year-old Tyy. and 10-month-old Tye. Both children have osteogenesis imperfecta, a genetic disorder characterized by fragile bones. Tyy.'s petition alleged she had a fractured humerus, and the parents failed and refused to seek treatment for nine days. The Agency learned that during an argument between the parents, T.D. grabbed Tyy.'s stroller and she was injured, but that was not alleged in the petition. Tye.'s petition alleged a failure to thrive, in that she had gained very little weight, and the parents had not addressed her condition. The girls were placed together in a foster home for medically fragile children.

The parents had Regional Center cases in Los Angeles, which were transferred to San Diego when they relocated here. After the stroller incident, police transported T.D. to a medical facility "for a 72-hour hold." According to medical records, he had a history

---

[1] To. D. joins in T.D.'s briefing.

2

of mental illness and had not been taking his prescribed medication. He was discharged with a recommendation to follow up with his outpatient psychiatrist and restart his medication, and the hold was discontinued.

In June 2012, the Agency filed amended petitions that added a count alleging facts pertaining to the stroller incident, and that T.D. suffered from mental illness, including depression and bipolar disorder, and he had not received regular refills of his medication during the previous six months. The Agency moved to dismiss the original count of Tye.'s petition on failure to thrive.

In July 2012, the court sustained the petitions, declared the girls dependents of the court, and removed them from parental custody. The court ordered the parents to comply with their case plans.

At the six-month review hearing, the court ordered an additional six months of services. T.D. had completed a psychological evaluation, and he was found to have attention deficit disorder, mild mental retardation, and fetal alcohol syndrome. The evaluator believed there was "a less than average probability that [he would] benefit from reunification services within the court mandated time frame." To. D. had also completed a psychological evaluation. She "was diagnosed with a [m]ood [d]isorder," and mild mental retardation with "paranoid features." She reported "mild cerebral palsy, impaired pulmonary functioning secondary to premature birth, [and] in utero exposure to alcohol." Her evaluator assessed her ability to benefit from services as "guarded."

At the 12-month review hearing, the court again ordered an additional six months of services, even though the Agency and the court-appointed special advocate (CASA)

3

recommended the termination of services and the scheduling of a permanency planning hearing under Welfare and Institutions Code[2] section 366.26. The parents had not consistently taken their medications, and in the social worker's opinion they had "not demonstrated enough progress to show that they would be able to safely care for their children on their own." T.D. told the CASA he understood "he cannot care for [the girls] at this time and . . . wants them to be safe."

At the 18-month review hearing, the court terminated reunification services and scheduled a section 366.26 hearing. The Agency advised that the parents were unable to provide for the girls' special needs. They had not been able to address their own needs, they engaged in loud arguing, "demonstrated poor decision making," and lacked stable housing.

In its September 2014 assessment report, the Agency recommended the termination of parental rights and a permanent plan of adoption. The report stated Tyy. had fallen and broken both legs and an arm. She had a slow recovery but was able to walk again. Both girls wore leg braces and had periodical infusion therapy to strengthen their bones and muscles. The report described Tyy. as "happy-go-lucky." She enjoys "crafts, drawing, playing with toys, and watching cartoons or movies." The report described Tye. as "goofy." She "has developmental delays in her gross motor skills" and speech issues.

---

2      All further statutory references are to the Welfare and Institutions Code.

The social worker assessed the girls as generally adoptable because there were 15 San Diego County families with approved home studies willing to adopt siblings with their characteristics, and numerous families willing to adopt one child with their characteristics. Since the girls had always been placed together, however, the Agency intended to consider only families willing to adopt both of them. At that time, no specific adoptive family had been identified.

In a January 2015 addendum report, the Agency advised that Tye. had broken a leg, and a rod was surgically installed in the leg. In November 2014, a prospective adoptive family "expressly sought out [Tyy. and Tye.] as they saw the girls on Adopt 8." On November 13, "the adoptive telling was read to [the prospective] adoptive family."

The Agency chose the family for adoptive placement for several reasons. It had been "an Options Licensed Foster Home for many years, and [it] had several children with significant medical needs in [the] home." The parents were "familiar with working with medical providers to communicate and advocate for children's needs." The mother is a stay-at-home parent, and the father has a flexible work schedule, and thus they are available for all medical appointments. The prospective "adoptive parents' children, [whom] they adopted from the county over [10] years ago, have specialized educational needs," and the parents "are highly skilled at working with the school district to advocate for the children's needs."

The report also states that on November 19, 2014, the girls met and began spending time with the family. While "the girls' transition was somewhat hampered by [Tye.] breaking her leg," the incident "gave the prospective adoptive parents a very clear

5

picture of the specialized care that the girls require." They attended medical appointments with the girls, and they were at the hospital during Tye.'s surgery. Further, they contacted the school in their district about the girls' enrollment. On December 24, 2014, the girls were placed in their home.

A report by the CASA also recommended adoption. The CASA observed that the girls "were immediately at ease" around the prospective adoptive family, the "potential adoptive mother was very loving and attentive to [the girls]," and the "potential adoptive father was very playful and loving as well." There are two older children in the home, who "appeared as healthy, happy, and respectful." The parents "appear[ed] to be emotionally invested in the girls already."

At the hearing on January 7, 2015, the social worker testified the girls are generally and specifically adoptable. There were 20 prospective adoptive homes for a child with Tyy.'s characteristics, 28 prospective adoptive homes for a child with Tye.'s characteristics, and 15 prospective adoptive homes for the sibling set. Further, their current caregivers wish to adopt the girls and "are capable of providing the type of care and provisions [they] need."

The parents were opposed to adoption. T.D. noted that despite the number of families reportedly interested in adopting children with the girls' characteristics, the Agency was unable to place them in a prospective adoptive home until December 24, 2014. He argued that is "not a long enough time to indicate whether they are able to really take on the specific needs that these children have." He asserted that attending the girls' infusion treatments, which require several hours in the hospital, and other medical

6

appointments and occupational therapy "is a heavy task for anybody to take on." To. D. added, "All accounts at this point [are] that the caretakers are great, excellent, but the risk we run of terminating parental rights today is that the caretakers may not be able to keep up [with] this pace."

Minors' counsel argued for adoption. Counsel noted that the prospective adoptive family had "spent a lot of time" with the girls since November 19, 2014, the family was aware of the girls' special needs, and "[t]his is a skilled adoption/foster home" that has cared for "many children with special needs over the years."

The court determined it is likely the children will be adopted if parental rights are terminated. The court explained: "[T]hey are in a home [that] is ready, willing and able to adopt. In this particular case, it appears [the Agency has] gone to great lengths to try to find a home. It appears that the reason it took longer than usual is [the Agency] wanted to make sure that there was someone who was able and capable of doing it. There is no [100] percent guarantee, but the evidence is they are specifically adoptable because these people are willing to adopt. With regard to general adoptability, there are numbers in the report. And I understand counsel's argument that those are just standard things in the report, but that's evidence that's uncontradicted, that there are homes located." The court terminated parental rights and selected adoption as the preferred permanent plan.

# DISCUSSION[3]

## A

"If there is no probability a child will reunify with his or her parents, adoption is the Legislature's preferred plan. [Citation.] To select and implement adoption as a child's permanent plan, the court must first find, by clear and convincing evidence, it is likely the child will be adopted if parental rights are terminated." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 956.)

"The issue of adoptability 'focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.' [Citation.] And '[u]sually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor.' [Citation.] In some cases, a minor 'who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child.' [Citation.] And when a child is deemed adoptable 'only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' " (*In re Jose C.* (2010) 188 Cal.App.4th 147, 158.)

---

[3] Minors' trial counsel agrees with the Agency's position.

"We review a finding of adoptability for substantial evidence [citation], and '[t]he appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order.' " (*In re Jose C.*, *supra*, 188 Cal.App.4th at p. 158.) "The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

B

The parents contend "substantial evidence did not show it was likely [Tyy.] and [Tye.] would be adopted within a reasonable period of time as both children had osteogenesis imperfecta, a serious medical and developmental condition that severely limited the pool of families interested in adopting them." They make several assertions about the condition and its prognosis that are apparently gleaned from an Internet source. They do not cite the appellate record to show the information was before the juvenile court (see Cal. Rules of Court, rule 8.204(a)(1)(C)), and we disregard factual assertions attributed to sources outside the record. (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 457.)

We conclude substantial evidence supports a finding of the likelihood of adoption within a reasonable time. Despite their fragile medical conditions, the Agency reported that the girls are generally adoptable because it had identified 15 families willing to adopt a sibling set with their characteristics. This evidence was undisputed.

The parents incorrectly assert that because the girls were bonded and the Agency intended to place them together, "the court needed very strong evidence there was a

9

specific family committed to adopting them."  "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' "  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  "If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home."  (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

Further, the evidence shows the girls are specifically adoptable.  The prospective adoptive parents are longtime foster parents who have cared for children with special needs, they understood the girls' needs, and they wished to adopt them.  The parents' argument is that the children had lived with the prospective adoptive parents only two weeks, but they cite no authority suggesting the timing prohibited the court from finding them specifically adoptable.  Further, the prospective adoptive family met and began spending time with the girls on November 19, 2014, approximately seven weeks before the hearing.

The parents' reliance on *In re Asia L.* (2003) 107 Cal.App.4th 498 is misplaced.  In *Asia*, the children's emotional and psychological development presented a potential obstacle to adoption, and they "would require specialized placement."  (*Id.* at p. 512.) *Asia* states "the foster parents' willingness to explore the option of adopting James and Asia is too vague to be considered evidence that some family, if not this foster family, would be willing to adopt these children."  (*Ibid.*)  Here, the prospective adoptive parents did not have a vague willingness to explore adoption, they were committed to adoption.

10

C

The parents also assert reversal is required because the Agency conducted an inadequate assessment of the prospective adoptive family. An assessment report is required to include a "preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent . . . , to include a social history, including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption . . . ." (§ 361.5, subd. (g)(1)(D).) Further, the report is required to include an explanation of the "relationship of the child to any identified prospective adoptive parent . . . the duration and character of the relationship, the degree of attachment of the child to the prospective . . . adoptive parent, the . . . adoptive parent's strong commitment to caring permanently for the child, [and] the motivation for seeking adoption." (§ 361.5, subd. (g)(1)(E).)

The Agency's assessment report is deficient insofar as the prospective adoptive parents are concerned.[4] However, because they are licensed foster care and adoptive parents, the court could reasonably presume they have been screened for criminal records and child abuse or neglect, and they are familiar with the legal rights and responsibilities of adoption. It is apparent from the Agency's report that the girls are unrelated to the prospective adoptive parents, and since the girls had only known them for about seven

_____

4      In his reply brief, T.D. incorrectly claims "the [A]gency failed to provide any assessment report at all." In its January 2015 addendum to its September 2014 assessment report, the Agency discussed the prospective adoptive family.

11

weeks, a strong attachment had likely not formed. As to a commitment to adopt, the Agency's addendum report states the prospective adoptive parents sought out the girls for adoption.

"Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights. Such deficiencies, however, will ordinarily not amount to a deprivation of procedural due process." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.) The parents claim no due process violation. Further, the deficiencies "appear not to have concerned the court or any counsel at the time of the hearing." (*Ibid.*) The parents argued the girls were in the prospective adoptive parents' home an insufficient amount of time to gauge their commitment to adopt, and there is no nexus between this issue and the deficiencies in the assessment report. To. D. conceded that except for the short placement period, the prospective adoptive parents "are great, excellent." Reviewing the totality of evidence, including the assessment and addendum reports, the report of the CASA, and the live testimony of the social worker, substantial evidence supports the adoptability finding.

DISPOSITION

The judgment is affirmed.

McDONALD, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.