Filed 6/26/14  In re A.R. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re A.R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G049270 |
| Plaintiff and Respondent, | (Super. Ct. Nos. DP022319, DP022320) |
| v. | O P I N I O N |
| CHRISTINE W. et al., | |
| Defendants and Appellants. | |

Appeals from a judgment of the Superior Court of Orange County, Kimberly Menninger, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant Christine W.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant David R.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

\*       \*       \*

Christine W. (the mother) and David R. (the father)[1] appeal from the termination of their parental rights as to their daughters A. (born March 2010) and Autumn (born January 2012) (collectively the girls or the children).  The mother argues the court erred by denying her petition pursuant to Welfare and Institutions Code section 388[2] and failing to apply the parental and sibling benefit exceptions.  Because we conclude these arguments lack merit, we affirm.

I

FACTS

*Prior Dependency Case*

In 2005, the mother had a dependency case involving another child, Felicity.  When she was two years old, she was detained due to her parents' arrests[3] for possession of methamphetamine.  The mother admitted she had used methamphetamine for "several years."  They successfully reunified in 2007.  By 2012, Felicity lived with

---

[1] While the father joins the mother's brief, he argues no other issues.  We include facts concerning the father only as relevant.

[2] Subsequent statutory references are to the Welfare and Institutions Code.

[3] The father in this case is not Felicity's father, who was in state prison at the time the girls were detained.

the mother's ex-husband, Jim W. One of the mother's older children also lived with Jim, and her two oldest children were in their 20's and independent.

*Detention*

In March 2012, the father was on parole, and law enforcement did a parole search of his residence due to suspicion of counterfeiting. In addition to several counterfeit bills, the officer found needles, other drug paraphernalia, and methamphetamine. There were exposed electrical wires and no food or refrigerator in the house. No clothes for the girls were found. The parents were arrested. Both parents had lengthy criminal histories. Between 1993 and 2011, the mother had been arrested numerous times for drug offenses and driving under the influence, as well as other crimes.

Shortly after detention, the Orange County Social Services Agency (SSA) filed a petition under section 300, subdivisions (b), (g), and (j), alleging failure to protect, no provision for support, and prior abuse of a sibling. SSA alleged the mother had an unresolved substance abuse problem and returning the girls would constitute a substantial danger to them. The court agreed and detained the girls a few days later, granting monitored visitation while the parents were incarcerated.

*Jurisdiction and Disposition*

SSA prepared a report prior to the jurisdiction/disposition hearing, which stated the girls had been placed in a foster home. They appeared to be doing well. Both parents stated they wanted to get their children back. The mother, who was still incarcerated, began participating in available services. The mother told SSA that she had been sexually abused by her stepfather at the age of nine. She dropped out of high school after ninth grade, when she became pregnant with her first child. She started using drugs when she was 20 years old, and her drugs of choice were pain killers, methamphetamine,

3

and marijuana. She had been married once before, to Jim W., and denied any domestic violence during that relationship, but admitted to drug use. She said she had a close relationship with all of her children. She was not married to the father, but they had been together for eight years. She denied any domestic violence. The mother said she was currently trying to get into a residential treatment program. She had completed such a program in the past.

Based on the criminal activity, the drug paraphernalia, lack of necessities such as food and clothing, and unsafe condition of the home, SSA found the allegations of neglect substantiated. There was particular concern due to the parents' criminal history and the mother's previous dependency case. SSA recommended the petition be sustained and reunification services offered to the parents.

On April 24, the parents submitted on the petition and reports, waiving their right to a trial. The court sustained the petition and set a disposition hearing. On April 26, the girls visited the mother in jail. The mother was happy to see them, but the girls could only manage a visit of about 30 minutes. A visit on May 3 appeared to be similarly challenging, mainly due to the conditions.

The mother was released from jail by May 9, 2012. She was referred for assessment to dependency drug court (DCC), which is part of Orange County's collaborative courts program. She was also provided with numerous other referrals, including counseling and parenting classes, and discussed options for drug treatment as well as drug testing requirements with the social worker. The mother indicated she was living with a friend. She had a visit with the girls the next day, which appeared to be friendly.

Shortly thereafter, the mother enrolled in DCC. The program had stringent requirements for reporting to court, communication with her social worker and compliance with treatment. Her first DCC report stated she was in compliance, and enjoying visitation. Prior to the disposition hearing, SSA filed an addendum report

4

indicating the mother was in compliance with DCC requirements. Her intake motivation assessment scores showed that while the mother showed greater recognition of her problem than the average client, she was also less ready to take action and commit than the average client.

On June 8, visitation was increased to six hours a week. Visits took place several times at a local park for approximately two hours each. Felicity joined the mother on visits. The visits seemed to go well, and the girls enjoyed snacks and played in the park. On one occasion, A. was tearful when the visit was over, but the social worker reported she quickly fell asleep after leaving. Later in June, visitation was liberalized from monitored to supervised, twice weekly for two hours.

At the June 18 disposition hearing, without objection, the court concluded that returning the girls to their parents' custody would be detrimental. The court ordered custody vested in SSA and ordered continued services. A six-month review date was set.

*Six-Month Review Period*

With respect to DDC, the mother continued to do well, and was in compliance with the requirements for testing, counseling, and meetings. She advanced to unmonitored visits of 12 hours per week by September, and weekly overnight visits by October. SSA described the relationship as "positive, loving and consistent." She was attentive and appropriate, gave each child attention, and was able to redirect them when needed. The mother was living with her ex-husband, Jim W., and his family during this time, and she was unemployed. Her criminal case was resolved, and she was placed on three years' probation with 270 days stayed.

On September 25, the mother was in a car with the father, who by this time had been released from jail. She was with the father when he fled the scene of a collision. Days later, she was told the police department wanted to meet with her, and

5

she gave a statement. She then reported the incident to her probation officer. The parents were subsequently ordered to have no contact with each other.

Despite this lapse, the mother continued to receive positive reports from DDC in October. Her calls to her social worker were reduced, as were the frequency of her 12-step meetings. In mid-November, the social worker reported the mother could not be reached for several days, missed a counseling session, and did not provide a visitation schedule. The mother said she had been with her brother. She was counseled on the importance of maintaining contact. At her next hearing at DDC, the court directed the mother to wear a drug patch and reinstated daily calls to the social worker.

By December, the mother appeared to be back on track and in compliance with DDC's requirements. SSA's reports on the visits with the girls were also generally positive. Felicity attended visits at times. When discussing a make-up visit, the mother indicated she wanted to keep the visits to two hours because otherwise the girls became bored. Visits were increased in December to include weekends. A. referred to the mother as "mommy" and ran into her arms during visits.

In general, the girls were doing well in their foster home. A. was energetic, but engaged in regular tantrums. Overall, SSA felt the prognosis for reunification with the mother was good. The mother needed stable and appropriate housing, however, and SSA therefore recommended six additional months of services. At the hearing on December 17, 2012, the court adopted SSA's recommendation and continued services to a 12-month review.

*Twelve-Month Review Period*

Unfortunately, just a few days later, on December 20, DDC reported the mother received a positive drug patch for methamphetamines. The mother adamantly denied any relapse. The social worker counseled her to continue to work on her recovery, surround herself with support, and stay focused despite this information. Her

6

visits were reduced to 10 hours monitored.[4]  The mother also had failed to follow through with an interview at a housing program she had applied for.  At a DCC hearing a few days later, the mother admitted the drug test was a "legitimate positive."  The court reinstated daily 12-step meetings and daily calls to the social worker.

In January 2013, the social worker reported she missed a parenting class. The mother appeared indifferent about failing to attend or to notify anyone that she would not be attending.  The following week, it was reported that she was adamant about having the drug patch removed.  She also requested visitation in two hour increments because she felt that A. became fussy and bored.  Otherwise, she was in compliance with DDC requirements.

The mother's counselor was concerned the mother did not have an income or stable place to reside with the children.  She had not taken steps to resolve those issues.  Some kind of altercation, that was "reminiscent of other altercations she has had in the past" took place during a visit, but no details were provided.

On February 1, her therapist suggested more structure, such as a residential treatment program.  She had trouble following through on completing tasks such as scheduling her activities, investigating education opportunities, or getting a driver's license.  She did continue to participate in DCC with clean test results, and in late March she was again allowed some unmonitored visitation.  Her therapist reported she did not "seem to have the insight that it is hoped she will gain after a period of just following directions."  By the end of March, the mother reported that she was felling happy and confident in her progress.

During this period, the father's probation officer lifted the no-contact order. He began visiting, but the visits were inconsistent and somewhat troubled.  A. displayed

---

[4] The foster mother subsequently reported the reduced visits had a negative impact on A., including difficulty sleeping at times and calling out for "Mommy."

an increase in crying, temper and mood swings and was referred to counseling and play therapy.

In its initial report prior to the review hearing, SSA recommended continued services. The mother's cooperation with her case plan was characterized as "moderate." With respect to visits, Felicity accompanied the mother on approximately eight of the visits. Reports on the monitored visits were generally positive. The mother and the girls would often go to a McDonald's to eat and use the play area. At times they would go to the park afterward. A. referred to the mother as "mommy" and was excited to see her at the beginning of visits. Sometimes leaving the visit would be difficult for her. The visits appeared to be generally pleasant and the mother acted appropriately. SSA characterized the relationship as "positive, loving and consistent."

In an addendum report, SSA reported that the mother's recent drug patch for April 1 to 10 tested positive for methamphetamines. The mother adamantly denied using drugs. Her next patch, for April 10 to 19, was also positive, though at a lower level. Random urine screens on April 17, 27, and May 3 were negative. During a hearing in DDC court on April 26, the mother said she was "hanging out with the wrong people and I'm owning it." When the court asked whether she was owning hanging out with the wrong people" she replied "yes, and the fact that it was positive." The court terminated the mother from DDC, ordered a referral to residential treatment and encouraged her to enroll.

SSA changed its position in the addendum report and recommended terminating services. At the hearing on May 23, 2013, the mother's counsel informed the court that he did not believe he had the facts to advocate for extending services. He had explained the mother's constitutional rights to her and informed her of her right to file a section 388 petition. The court was also advised the mother was about to enter a residential treatment program. The court terminated services and scheduled a permanency planning hearing pursuant to section 366.26.

8

*Section 366.26 Hearing and 388 Petition*

Multiple reports were prepared prior to the section 366.26 hearing. Both children were assessed as adoptable, although placement was difficult because of the sibling relationship. The mother was authorized for monitored visits for 10 hours a week. The visits went well. The girls were excited to see the mother and she was attentive and appropriate. Between May 1 and July 23 she visited approximately 21 times, generally for about two hours. Felicity was present for two visits in July.

SSA also reported that A.'s troublesome behaviors seemed to have decreased after the father stopped visiting, and she continued to receive therapy.

The mother was in a residential treatment program from June 13 to September 2. She then moved into a different treatment facility on September 10, and visits stopped for about three weeks.

By September 3, the girls were placed in a potential adoptive home with an approved home study. By that time, A. was approximately three and a half years old and Autumn was 18 months old. Very shortly thereafter, A. asked the prospective adoptive mother if she could call her "mom" and talked about having two moms. The girls appeared content and comfortable with the prospective adoptive parents. They were affectionate with them and comfortable approaching them for reassurance, comfort or other interaction. By late October they were calling the prospective adoptive parents "Mommy" and "Daddy" and appeared to have developed a bond with them. A. said she loved living there and wanted to stay.

When visits with the mother resumed in early October, A. displayed regression, anger and tantrums. She told the prospective adoptive mother she did not want to go back to where the mother was living, saying that "[i]t's dirty and smells. I don't want to visit my Mommy. I want to stay here."

In late October, the mother filed a section 388 petition, asking the court to either return the children to her or provide further services. She stated in her declaration

9

that she had successfully completed one residential recovery program and was making progress in another. She expected to complete it by March 2014. She was also working on her GED. She felt that it was in the best interests of the children to reunify with her because she had developed a significant parent-child relationship and bond with them. She attached documentation from her recovery programs and a letter from the former foster mother supporting reunification.

The court heard argument from counsel. County counsel was opposed to granting the 388, arguing no change in circumstances and that further services or reunification would not be in the girls' best interests. The court concluded the mother failed to make a prima facie showing of changed circumstances, and denied the petition. The court acknowledged the mother's progress but found the mother's claims of sobriety lacked credibility due to her prior reluctance to take responsibility for relapses, and she had not provided proof of testing clean for a sufficient period. The mother continued to lack employment and independent housing.

Less than a week later, Felicity filed her own section 388 petition. She asked the court for visitation with her sisters. If the court terminated the mother's parental rights, she would lose contact with them. She described her relationship with her sisters as "close" and stated "we grew up together and share a common history." At the hearing, none of the counsel present requested appointment of a guardian ad litem or attorney for Felicity. The mother's counsel argued in favor of the motion. The court noted that Felicity had done a "good job of trying to file a document before the court," but she had not shown a change of circumstances that would justify granting a full hearing. Felicity had argued that she wanted to maintain a relationship with her sisters, but she had not demonstrated changed circumstances or that granting the motion would be in the girls' best interests.

At the section 366.26 hearing, which began on November 5, 2013, the court heard from the mother, Felicity, the mother's substance abuse counsel at her current

placement, Diane Burd, the prior foster mother, and the social worker. We limit our discussion of their testimony to the issues relevant in this appeal.

The mother testified that she had been sober since April 11, 2013. She testified that A. yells "mommy" and runs over to her at visits. She characterized her relationship with A. as "very close." She felt it would be detrimental to the girls if she did not see them, because "nothing can ever replace my love for them." The mother testified that Felicity accompanied her on "most of the visits," and that Felicity and A. loved each other.

Felicity testified that she saw the girls about twice a week since detention. She described a typical visit as ordering food and playing together. She said A. would call to her as "sissy" when she arrived, but also knew her name. Felicity believed her sisters would benefit from an ongoing relationship with her.

The mother's substance abuse counselor at her most recent placement, Diane Burd, also testified. She had seen the girls and the mother interacting for a total of 15 to 20 minutes. She had seen the girls come visit the mother a few days before trial. A. yelled "Mommy, Mommy!" and was very happy to see the mother. She testified the girls appeared to be affectionate toward the mother and their interaction appeared natural and "motherly." She saw A. cry toward the end of a visit because she did not want to leave.

The former foster mother, Chris D., testified that the girls had been placed with her for about a year and a half. Chris monitored many of the mother's visits, and also saw Felicity at about 10 to 20 visits. A. always called her mother "Mommy" and was excited to see her. After the mother's "slip up," when visits decreased, Chris said A. was very upset. Chris also said the girls both "adore[d]" Felicity and knew she was their big sister. She agreed the mother had a beneficial relationship with the girls. She considered the mother a friend.

11

The social worker testified that Felicity attended the mother's visits with the girls approximately once a month. The girls were doing well in their prospective adoptive placement and called the prospective adoptive parents "mom and dad." At her most recent visit, neither of the girls had asked for their mother or Felicity, nor had the prospective adoptive parents told her they had done so.

The social worker did not feel that Chris was honest in her testimony about A.'s reactions to the mother's visits. Chris had never reported to the social worker that A. reacted negatively when the mother's visits decreased. Further, the prospective adoptive mother had reported A. would display outbursts and tantrums when she returned from visits. In the past few weeks, A. had improved and ending therapy was being considered.

After testimony concluded, the court heard argument from counsel. The court made detailed findings, including the conditions leading to detention, the prior dependency case involving Felicity, and the mother's criminal history, which, from 1993 to 2011, involved seven alcohol or drug-related offenses. The court also reviewed the mother's enrollment in DDC and her positive drug patches which led to her termination from the program.

The court credited SSA's report regarding the girls' status in the current placement, including A.'s statements that she wanted to stay there and did not want to visit her mother. The court found the girls were adoptable.

Once children are found adoptable, the court must terminate parental rights absent specified circumstances. The mother was arguing two such circumstances — section 366.26, subdivision (c)(1)(B)(i), typically known as the parental benefit exception, and the sibling relationship exception found in section 366.26, subdivision (c)(1)(B)(v). After extensively reviewing the facts, the court found that neither exception applied, and terminated parental rights. The parents now appeal.

12

DISCUSSION

*Section 388 Petition*

The mother[5] first challenges the trial court's decision to deny her section 388 petition without a hearing. We review such a determination for abuse of discretion.

"We must uphold the juvenile court's denial of appellant's section 388 petition unless we can determine from the record that its decisions '"exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citations.]' [Citations.]" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

In pertinent part, section 388, subdivision (a)(1) provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order [the] court previously made . . . ." If the petitioning party presents a prima facie case that the statute applies, a hearing should be granted.

"The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' [Citations.] There are two parts to the prima facie showing: The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children. [Citation.] If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) "The prima

---

[5] Felicity also challenges the denial of her section 388 petition. We address her contention in a separate appeal, *In re A.R.* (June 26, 2014, G049265) [nonpub. opn.].)

13

facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

We agree with the trial court that the mother failed to make a prima facie showing of changed circumstances. She had completed one residential treatment program and was participating in another, which would not be complete until March 2014. She asserted that she drug tested at the first program and had no positive tests, and was participating in individual and group counseling and a 12-step program.

The mother's only evidence in support of her petition was her own declaration, letters from both residential treatment programs regarding her participation, and a letter from Chris D. But none of these demonstrated a true change in circumstances. The letters from the treatment programs stated that she had done or was doing well. So had numerous reports during the history of this case. Chris D.'s letter only addressed the mother's sobriety by stating the mother "knows that missteps are a part of life but she remains confident and positive." The mother made similar statements, however, throughout the pendency of detention.

Given the history of this case, other than the setting of the mother's treatment, she did not offer evidence of a true change. Assuming she had stayed clean since April, the date of her last positive drug patch, until the hearing on her petition in late October, she had been drug free for approximately seven months.[6] But she had also been clean from June to December 2012, also approximately seven months. (See *In re Clifton B.* (2000) 81 Cal.App.4th 415, 423 ["seven months of sobriety since [the father's] relapse . . . while commendable, was nothing new."].)

---

[6] The mother's argument that "it was clear that she had never truly relapsed" is simply without merit. The amount of drugs found in her April patch was taken into consideration by the lab, and the juvenile court rejected the argument she had stayed clean at the May hearing. Because she did not seek writ review of the order terminating services, she cannot relitigate these issues now.

14

Moreover, the first residential treatment program she completed in June 2013 was the same program she completed seven or eight years ago. Thus, while it was commendable that the mother appeared to be making progress, periods of sobriety and relapse were nothing new for her and did not demonstrate changed circumstances. There was simply nothing new or remarkable in her petition. Because the mother did not show changed circumstances, we need not consider whether a full hearing on the petition would have been in the girls' best interests. We conclude the court did not err by summarily denying the mother's petition.

*Parental Benefit Exception*

The mother next argues the trial court erred by refusing to apply the parental benefit exception. We review findings as to the section 366.26 exceptions under the substantial evidence test.[7] (*In re S.B.* (2008) 164 Cal.App.4th 289, 297; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) In applying the substantial evidence test, "[w]e do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Once the juvenile court determines that there is no probability of reunification, adoption is the preferred permanent plan. (§ 366.26, subd. (b)(1); *In re Edward R.* (1993) 12 Cal.App.4th 116, 122.) Should the court find it likely that the child will be adopted if parental rights are terminated, the burden shifts to the parent or parents

_____

[7] *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, held that abuse of discretion was the appropriate standard, but noted, "The practical differences between the two standards of review are not significant."

15

opposing adoption to demonstrate that termination would be detrimental to the child under one of four statutory exceptions. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.)

One of these is the benefit exception, which requires an affirmative showing by the parent that termination would be detrimental to the child because the parent has maintained regular visitation and contact and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) The substantive positive emotional attachment must be such that the child would be "greatly harmed" if deprived of the parent-child relationship. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Moreover, the court must find that the strength of the parent-child relationship outweighs the potential benefit of adoption.[8] (*Ibid.*)

The first prong of the benefit exception is regular visitation and contact in a parental role. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420.) To meet the burden of proving the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)

There is no question the mother had frequent visits with the girls, meeting the first prong of the parental benefit exception. If visitation and contact is sufficient, the court must also determine whether a child would benefit from continuing the relationship

---

[8] This is a high standard to meet on appeal. The beneficial relationship exception to the termination of parental rights "may be the most unsuccessfully litigated issue in the history of law." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5, disapproved on other grounds as stated in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)

16

with the parent, balancing "the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) In determining the existence of a beneficial relationship, we look to "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs . . . ." (*Id.* at p. 576.)

The trial court acknowledged that the mother "dearly loves her children, but that is not enough." We agree. At the time of detention, A. was days away from her second birthday and Autumn was an infant. By the time of the .26 hearing, A. was approximately three years and eight months, and Autumn was approximately 22 months old. A. had spent nearly half her life outside her mother's custody, and Autumn nearly her entire life. Neither factor militates in the mother's favor. With respect to the quality of the relationship, the evidence showed that the visits were loving and pleasant, but no significant evidence supports the contention that the girls would be greatly harmed if the mother's rights were terminated.

Indeed, the evidence demonstrated to the contrary — that A. in particular would benefit greatly from the security of an adoptive home. Given the considerable risk of further relapses by the mother, and the problems that followed when visits with the mother suddenly stopped or changed, a clear pattern emerged that A. was desperately in need of security and consistency.

Other evidence relating to the prospective adoptive home also supports the court's conclusion. While A. called the mother "mommy," but she also called the prospective adoptive mother "mom." A. was stable in the prospective adoptive home, and both girls had a comfortable relationship with their prospective adoptive parents. A.

17

had said that she wanted to stay there, which is evidence she would not be greatly harmed by terminating the parents' rights.

There is no doubt in our mind that the mother loves her children. But unfortunately, she has been unable to conquer her addiction in a way that would allow them to safely and securely return to her custody at any time in the foreseeable future. While the mother was definitely bonded to the children, the same bond cannot be seen in her two small children. The trial court therefore had substantial evidence from which to conclude the parental benefit exception did not apply.

*Sibling Benefit Exception*

The mother next argues that the court should have applied the "sibling relationship" exception found in section 366.26, subdivision (c)(1)(B)(v). As with the benefit exception, we review the court's findings for substantial evidence. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

This exception applies when terminating parental rights would be detrimental to the child because "[t]here would be substantial interference with [the] child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v).) "In enacting this exception, the legislature was concerned with preserving long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.)

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child." (*In re L. Y. L.*, *supra*, 101 Cal.App.4th at p. 952, fn. omitted.) Factors relevant to the analysis include whether the child and the sibling were raised together in the same home, whether they shared significant common experiences, whether they have a close and strong bond, and whether continued contact with the

sibling is in the child's best interests compared to the benefit of legal permanence through adoption.  (§ 366.26, subd. (c)(1)(B)(v).)

The mother argues Felicity's relationship with the children is a relevant consideration, citing *In re Celine R.* (2003) 31 Cal.4th 45.  In that case, the Supreme Court stated:  "Counsel for the children argues that the 'court must examine the relationship among all the siblings in considering' the sibling relationship exception and 'may not restrict its inquiry to the children at issue in the hearing before the court.'  In a way, this is correct.  The sibling's relationship with the child is not irrelevant. Certainly, evidence of the sibling's relationship with the child and, if the sibling is articulate, perhaps of the sibling's views of that relationship, might be relevant as indirect evidence of the effect the adoption may have on the adoptive child.  A nonadoptive sibling's emotional resistance towards the proposed adoption may also implicate the interests of the adoptive child.  In an appropriate case, the court should carefully consider all evidence regarding the sibling relationship as it relates to possible detriment to the adoptive child.  *But the ultimate question is whether adoption would be detrimental to the adoptive child, not someone else.*  This conclusion does not mean that the court must totally disregard the interests of the sibling or the significance of the sibling relationship when it orders adoption.  When appropriate, the court can encourage the adoptive parents to agree to visits among the siblings although, as the court recognized in this case, it cannot require them to do so.  [Citations.]"  (*Id.* at p. 55, italics added.)

Thus, while Felicity's feelings were relevant, they were not paramount. With respect to the factors set forth in *In re L. Y. L.*, *supra*, 101 Cal.App.4th 942 the girls had never lived together.  Their only common experiences were their visits, and while As. called Felicity "sissy," and they clearly cared for each other, this was far from sufficient to demonstrate the bond between the girls and Felicity was so strong that it outweighed the benefits of legal permanence.  (§ 366.26, subd. (c)(1)(B)(v).)  We conclude the court did not err.

19

### III

### DISPOSITION

The judgment is affirmed.


                                          MOORE, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.