Filed 11/19/24  In re Kimberly K. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re Kimberly K., A Person Coming Under the Juvenile Court Law. | B336772 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22PSJP00020) |
| Plaintiff and Respondent, | |
| v. | |
| DAVID A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Father, David A., appeals from an order terminating his parental rights to his daughter, Kimberly K. (born January 2022), under Welfare and Institutions Code section 366.26.[1]  Father argues the juvenile court erroneously found father did not establish the parental-benefit exception to termination of parental rights applied.  We find father did not meet his burden to demonstrate the termination of parental rights would be detrimental to Kimberly under the parental-benefit exception.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**
**A.    Detention, Jurisdiction, and Disposition**

In early February 2022, the Los Angeles Department of Children and Family Services (DCFS) received a referral alleging that Kimberly's mother gave birth to her at home with the assistance of "[t]eenagers in the neighborhood[ ]" that "held the placenta and cut the umbilical cord with [a] shoelace."  Mother did not have any prenatal checkup, and Kimberly had not received any medical care since her birth.  There were also concerns with mother's home because there was "trash, junk and broken items everywhere outside the home" and "a bucket on the entrance of the home because the restroom [was] not working."  Mother and Kimberly were "often staying in a tent outside the

_____

[1]    All further statutory references are to the Welfare and Institutions Code.

2

home." Two days later, DCFS obtained authorization to remove Kimberly from mother.

DCFS filed a petition under section 300 alleging Kimberly was at risk of harm due to mother medically neglecting her and creating an endangering home environment. The juvenile court ordered Kimberly detained in shelter care from parental custody at the detention hearing. Kimberly was then placed with maternal aunt C.N. and her husband R.G. when she was less than a month old in February 2022.

Father's whereabouts were unknown. Mother and a paternal aunt told the social worker father was "gang-related with the MS-13 gang" and addicted to fentanyl. They also stated there were domestic violence incidents between mother and father.

DCFS was able to locate father and spoke with him in mid-March 2022. Father told the social worker he was on parole for extortion for a year. Father also stated he was no longer in a relationship with mother and did not know anything about Kimberly's birth.

In April 2022, DCFS filed an amended petition to add allegations about the parents' substance abuse and father's failure to protect Kimberly from mother. About a week later, DCFS reported father was incarcerated and sentenced to 730 days in county jail for a parole violation. DCFS was also informed mother was found deceased in her home. In late April 2022, DCFS filed a second amended petition alleging Kimberly was at risk of harm due to having no parent or guardian to provide care or supervision.

In August 2022, DCFS reported it provided father with Kimberly's caregiver's phone number the previous month, but

father did not make any efforts to contact the caregiver. At the jurisdiction and disposition hearing, the juvenile court found father was Kimberly's biological father, sustained the second amended petition based on father's substance abuse, removed Kimberly from father, ordered monitored visitation for father when out of custody, and ordered family reunification services for father. Father's reunification services included a drug and alcohol program, drug testing, individual counseling, and a parenting program.

## B.    Six-Month Review Period

Father was incarcerated for most of the first six-month review period. He did not contact DCFS while incarcerated. He was released from jail in early February 2023. A few weeks after his release, a social worker was able to speak with him. Father stated he wanted to obtain custody of Kimberly and understood he had six months to show his ability to care for her. He agreed to submit to weekly drug testing for DCFS.

At the six-month review hearing in March 2023, the juvenile court found father's progress was unsubstantial but continued family reunification services for him.

## C.    12-Month Review Period

In July 2023, DCFS reported father had not provided DCFS with proof of enrollment or participation in a drug and alcohol program, parenting program, or in individual counseling. He also did not submit to any drug testing.

DCFS and father agreed to monitored visitation on Saturdays and Sundays and that father could arrange additional visits when Kimberly's caregivers were available. Kimberly's

4

caregiver, C.N., reported father contacted her when he wanted visits, which were to take place at a mall. DCFS reported father was "fairly consistent" in visiting Kimberly. Kimberly's paternal grandmother attended every visit with father.

The social worker observed father meeting Kimberly for the first time at a visit in March 2023. DCFS reported father bonded with Kimberly, fed her, and walked around the mall with her in his arms. Kimberly appeared comfortable in father's and paternal grandmother's presence. When asked what his plans were for his daughter, father stated he was currently trying to get his life together. He said he did not have space in his home for Kimberly.

In September 2023, DCFS noted father's progress with his case plan was unsubstantial, and his communication with DCFS was "very limited to non-existent." Father participated in a parenting program but did not provide DCFS with a progress letter when requested. Father still had not submitted to any drug tests or participated in a drug program or counseling. C.N. reported Kimberly had gotten used to seeing father and did not appear shy or uncomfortable around him. Between March and September 2023, father visited Kimberly nine times. Father had also requested visits on four other dates, but the caregivers were unavailable due to pre-planned events and a hurricane warning on those days.

At the 12-month review hearing in October 2023, the juvenile court found father's progress with services was unsubstantial and terminated reunification services. The court set a section 366.26 permanency planning hearing.

**D.  Permanency Planning**

In its section 366.26 report, DCFS reported Kimberly remained placed with her caregivers, C.N. and R.G., who had been designated as her prospective adoptive parents.  C.N. and R.G. continued to meet all of Kimberly's physical, emotional, developmental, and medical needs.  Kimberly had eczema that could cause distress if her condition flared, and her caregivers ensured she received monthly shots to control the condition.  Kimberly also had strict dietary restrictions due to allergies and was being assessed for a possible speech delay.

DCFS reported that father agreed with the plan of adoption and was interested in being involved in Kimberly's life if she was adopted.  C.N. reported father and paternal grandmother were consistently visiting with Kimberly every other weekend.  Father was involved with changing diapers, feeding, and playing with Kimberly during visits.

In March 2024, DCFS reported Kimberly's caregivers continued to express their willingness to adopt Kimberly.  Kimberly referred to her caregivers as "momma" and "da-da."  Her caregivers stated they were open to father being in Kimberly's life as long as he remained a "healthy and positive person."

Caregiver C.N. reported father's visits were going well and that Kimberly loved paternal grandmother.  C.N. stated Kimberly ran to paternal grandmother at the start of visits and embraced her with a hug.  C.N. also stated Kimberly had a "bonded relationship" with father and referred to him by his first name.  Father acknowledged Kimberly was in a good home and did not want to disrupt that, but he stated terminating his

parental rights would cause him distress because it could allow the caregivers to keep Kimberly away from him.

In an interim review report, DCFS reported that when a dependency investigator asked father what his intentions were regarding the case, father said, "Why fix something that isn't broken?" He added, "She is fine where she is but I didn't know I was losing my parental rights." Kimberly's caregivers informed the social worker father had visits twice a month.

A virtual child and family team meeting was held to address father's questions and concerns. Caregiver C.N. assured father he would not lose his relationship with Kimberly because "they are family tied by their love for [her]." C.N. explained father was "kind and loving to Kimberly" and was "very patient with her." C.N. also explained that Kimberly initially had to attend numerous medical appointments, though now there were less. Father had not attended any of her appointments.

During the virtual meeting, Kimberly came to the phone and said, "Hi daddy." Father responded, "Hi baby." DCFS noted that based on her statement, Kimberly appeared to be aware of who her father was. However, DCFS also indicated that it was unknown if caregiver R.G. was in the background with C.N. during the meeting, so it could not determine whether Kimberly was saying "Hi" to father or R.G.

In assessing the bond between Kimberly and father, DCFS noted that Kimberly had never been in father's custody, he had not participated in any of her medical appointments, and "[f]amily time" between them was limited to monthly visits. DCFS assessed that although Kimberly was familiar with father, she did not appear to have a bonded relationship that would "impede her overall well-being" if their visits ended. There had

7

not been any reports of Kimberly becoming upset or distressed when visits concluded to suggest Kimberly wanted to remain with father.

**E.     Termination of Parental Rights**

The juvenile court held the section 366.26 hearing in April 2024.  DCFS requested the court terminate parental rights.  Father objected and argued the parental-benefit exception to adoption applied.  He requested the court order a legal guardianship.  Kimberly's counsel asserted that while father met the first two elements of the exception, he was unable to demonstrate severing his parental rights would be detrimental to Kimberly.

The juvenile court found father met the first two elements of the parental-benefit exception.  However, father did not establish the third element of the exception as he failed to show terminating parental rights would be detrimental to Kimberly even when balanced against the countervailing benefit of a new, adoptive home.  The court found Kimberly was adoptable, specifically by her caregivers C.N. and R.G., and terminated parental rights.  Father timely appealed.

**DISCUSSION**

**A.     Governing Law and Standard of Review**

After reunification services are terminated, the focus shifts to the needs of the child for permanency and stability.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  Where possible, adoption is the Legislature's preferred permanent plan.  (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 814 (*Andrew M.*); see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["'Adoption is the

8

Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker'"].) "'"[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'"'" (*In re I.E.* (2023) 91 Cal.App.5th 683, 690.)  Once the juvenile court determines a child is adoptable, the court must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under a specified statutory exception.  (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*).)

One of these exceptions is the parental-benefit exception, which applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The three elements a parent must prove, by a preponderance of the evidence, to establish the exception are: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

"A substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) The factual bases on which the juvenile court determines detriment under the third element are subject to substantial evidence; the ultimate weighing of facts and determination of detriment is reviewed for abuse of discretion.  (*Id.* at p. 640.)

"When reviewing for substantial evidence, ""we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.""" (*In re A.P.* (2024) 103 Cal.App.5th 1137, 1142 (*A.P.*).) Moreover, "[a] court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

**B.    The Juvenile Court Did Not Abuse its Discretion in Finding the Benefits of Adoption Outweighed Any Detriment in Terminating Parental Rights**

Father argues the juvenile court abused its discretion in determining that he failed to establish the third element of the parental-benefit exception, namely that terminating his relationship with Kimberly would be detrimental to her even when balanced against the benefits of a new, adoptive home. We discern no error in the court's findings concerning detriment.

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) This means the court must determine "how the child would be affected by losing the parental relationship—

10

in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*)

In determining the effect of severing a parent-child relationship, the court should not look to whether the parent can provide a home for the child. Instead, the court must look to the effects on the child from severing the relationship, which might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. [On the other hand,] a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, *supra*, 11 Cal.5th 614 at p. 633.)

Father asserts in a conclusory manner that terminating his parental rights "would undoubtedly expose [Kimberly] to bouts of depression and withdrawn behavior." However, father cites no evidence in the record to support his contention. (*In re S.C.* (2006) 138 Cal.App.4th 396, 406–407 ["When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited"].) Furthermore, the record contradicts father's assertion. There was no evidence that Kimberly ever became upset or distressed when visits with father ended; she did not act as though she wanted to remain with him. Further, an assessment by a social worker concluded that severing father's relationship with Kimberly would not cause her any emotional instability.

11

Father further asserts he maintained regular visits and interacted well with Kimberly during his monitored visits, and that "his purported substance abuse never affected his visits with" her. He points out that he fed her, changed her diapers, and walked around the mall with her in his arms. We recognize father acted appropriately with Kimberly during visits and appreciate that he cared for her. However, this evidence does not show that Kimberly's relationship with him was so significant that its termination would be detrimental to her. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) "There is no question that there are benefits in continued visits with loving parents to which the child has some substantial attachment. Yet to justify withholding the 'security,' 'stability,' and '"sense of belonging a new family would confer"' [Citation], the parents must prove more than '"some benefit"' [Citation]. . . . [T]hey must prove some type of harm beyond the fact that their loving visits would cease." (*Andrew M.*, *supra*, 102 Cal.App.5th at p. 820; see *Caden C.*, *supra*, 11 Cal.5th at p. 634.)

Additionally, father contends the detriment Kimberly would suffer is evidenced by the fact that she recognized him as her "daddy" during a virtual child and family team meeting. However, father does not show this is sufficient to deem the relationship between them strong for purposes of the detriment analysis. Kimberly never lived with father. She was less than one month old when she was placed in her caregivers' care. Father met Kimberly for the first time when she was over a year old in March 2023. He then had monitored visits once or twice a month. DCFS opined Kimberly's "overall well-being" would not be hindered if visits were to end.

Further, although Kimberly attended numerous medical appointments, father did not attend or participate in any appointments with her.  Father did not file a reply brief to address DCFS's assertion that his "lack of meaningful engagement or familiarity" with Kimberly's medical needs "is not a marker of a strong parent-child relationship."  (*Andrew M.*, *supra*, 102 Cal.App.5th at p. 819.)

To the extent father argues Kimberly would suffer detriment based on her relationship with paternal grandmother, "[t]he parental-benefit exception deals with the child's relationship with the *parents*, and it is not appropriate to consider relationships with other family members in assessing this exception: 'the Legislature recognized that in certain specific instances, a plan other than adoption may be appropriate and less detrimental to the rights of both parent and child.  [Citation.]  Preserving the child's relationships with relatives other than a parent [or sibling] was not one of those instances.'"  (*Andrew M.*, *supra*, 102 Cal.App.5th at pp. 818–819, citing *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165 & fn. 2 [child's relationship with grandmother irrelevant to termination of parental rights].)

Father also contends there was no evidence Kimberly's placement with her caregivers "would be jeopardized by retention of [ ] father's parental rights and the selection of a permanent plan of legal guardianship."  However, father cites no authority holding this consideration is relevant to determining whether Kimberly would suffer detriment by severing parental rights.  The statutory preference is for adoption, and the parental-benefit exception warrants deviation from this preference only in exceptional circumstances, which the juvenile court determined father had not shown.  (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The record supports the finding that Kimberly would not be detrimentally affected by having father's parental rights terminated and being adopted by her caregivers. Kimberly was well bonded to her caregivers and called them "momma" and "da-da." Her caregivers consistently met all her physical, emotional, developmental, and medical needs. Kimberly was essentially raised by them and was thriving in their care.

In sum, we conclude the juvenile court acted within its discretion in determining that father failed to meet his burden to establish the parental-benefit exception to termination of parental rights applied.

## DISPOSITION

The juvenile court's order is affirmed.


MORI, Acting P. J.

We concur:


ZUKIN, J.


**SIGGINS, J.

---

** Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14