Filed 10/13/20  In re K.Z. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION TWO

In re K.Z., et al., Persons Coming Under the Juvenile Court Law.

| | |
|---|---|
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E073374 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1101245) |
| v. | OPINION |
| C.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Cheryl C. Murphy, Judge. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Anna M. Marchand, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

The trial court removed mother's three older children after finding they were at risk of physical abuse and neglect due to her mental health problems and substance abuse. The trial court granted the children's father sole custody, set a visitation schedule for mother, and terminated the dependency proceedings.

Mother argues the court erred by terminating its jurisdiction over the children under Welfare and Safety Code section 361.2, subdivision (a) (unlabeled statutory citations refer to this code), rather than maintaining jurisdiction as also permitted by the same provision. We conclude the trial court did not abuse its discretion and therefore affirm.

I

FACTS

Mother is a single parent with four children: K.Z. (born in 2002), F.Z. (born in 2004), C.Z. (born in 2006), and K.R. (born in 2015). In April 2019, K.Z. was 16, F.Z. was 14, C.Z. was 12, and K.R. was four.[1] This appeal concerns only the oldest three children, K.Z., F.Z., and C.Z., who share a father. Father had a criminal history, which included a conviction for kidnapping. He spent 11 and a half years in prison but was released on September 9, 2015.

The Riverside County Department of Public Social Services (department) first received a referral about mother and her oldest three children in 2011. The department investigated and found C.Z. had scratch marks on his face and a black eye. C.Z. said he

_____

[1] K.Z., F.Z., and C.Z. will be referred to by their initials or as "the children" hereafter.

2

broke mother's TV " 'and she kept smacking my face and she scratched me.' " The department found allegations of general neglect substantiated and allegations of physical abuse unfounded. The department filed a petition under section 300 subdivisions (a), (b), (g), and (j) as to the children. The court denied father reunification services because he was incarcerated and had been convicted of a violent felony, but gave mother six months of family maintenance services. The court eventually terminated jurisdiction on April 12, 2012, and granted mother sole physical and legal custody of all three children.

On August 26, 2018, law enforcement responded to mother's home for a possible overdose. K.Z. had called the police because mother was naked and had locked herself in the bedroom. Mother refused to talk to the police and her boyfriend slammed the door on them.

On January 1, 2019, the department received another referral. The report said mother and C.Z. got into an argument, and mother threw a metal plate at his back. C.Z. was uninjured. When he went to mother's room to apologize, she slammed the door on his foot, causing bruising. Mother also threw a plastic laundry basket at F.Z., a trophy at the wall, a glass bottle at K.Z., and a glass of milk at both K.Z. and F.Z. F.Z. confronted mother, and mother elbowed F.Z. in the chest, pushed her on the bed, and attempted to strike F.Z. while F.Z. pushed back with her feet. The three oldest children then left the house and called father. The children later confirmed these reported events.

On January 10, the department questioned the children and father. F.Z. told the department mother was abusive towards the three oldest children. She said they had

called the police multiple times, but the police didn't do anything to protect them. She told the department she didn't want to live with mother and wanted to ask the court to let them live with father. Father told the department mother had a long history of drug use, and this wasn't the first time the children had requested his help. According to father, mother kicked the three children out of the home after the incident and all three were staying with him.

At some point before January 30, 2019, C.Z. returned to live with mother. Father said he took C.Z. to school for a science camp trip, and when C.Z. returned mother picked him up. K.Z. and F.Z. remained with father and on February 6 expressed distress at the idea of returning to live with mother.

On February 11, 2019, the department received another referral. C.Z.'s school called mother at 11:00 a.m. because he had a fever. Mother told the school she was on her way to pick him up. When she didn't arrive, the school attempted to call her three more times, and she stopped responding after the third attempt. Nobody picked C.Z. up until 6:10 p.m. Eight days later, C.Z. still hadn't returned to school.

On February 20, 2019, the social worker met with K.Z. and F.Z., who initially denied mother engaged in any domestic violence, but told the department she was physical towards K.R.'s father. They said they knew mother was using drugs and reported finding metal and glass pipes and white crystal in her makeup bag. K.Z. said she received a text from a neighbor saying the neighbor had found K.R. outside and had to

4

wake mother up to care for him. They didn't want to return to mother's custody, and the social worker found nothing objectionable about father's residence or care.

On March 26, 2019, the social worker went to mother's residence, but she wasn't there. Mother's sister and K.R.'s father told the social worker she was at a mental health hospital for an assessment and to help with her mood swings. K.R.'s father denied mother used drugs.

The social worker went to the mental health urgent care to interview mother. When the social worker arrived, mother was on the phone with K.R.'s father and was angry he'd told the social worker where she was. She told the social worker father was making up lies to get out of paying child support, denied any abuse, denied any neglect, and denied using drugs. She got angry at the social worker and tried to leave, eventually ending the interview early and agreeing to meet the following morning. When the social worker arrived at the home the next morning, mother didn't answer the door. Eventually, she texted to reschedule later that day. The social worker responded saying they could meet the next morning, but mother didn't respond.

The social worker arrived at mother's house unannounced the next morning anyway and found mother at home. She took a saliva drug test, which came back negative. She told the social worker she had anxiety and was taking medication for it. When the social worker recommended she attend a substance abuse program and obtain mental health services, she said she "really does not want to do it."

5

On March 28, 2019, the hospital provided mother with referrals to mental health services. She refused to attend substance abuse counseling, because she claimed she didn't have a substance abuse problem.

On April 1, 2019, father told the department C.Z. sent him a picture of mother's pipe which she used to smoke marijuana. On April 2, the social worker made an unannounced visit to mother. Mother said she would participate in family maintenance services, but wanted father to participate too. When asked about the picture of the marijuana pipe, she denied having a pipe. The social worker requested to speak to C.Z. alone, but mother refused. Instead, the social worker spoke to C.Z. with mother present. C.Z. confirmed he sent the picture of the pipe, and said he found it in mother's bathroom. Mother instructed C.Z. to tell the social worker father coached him to say that. C.Z. denied father had coached him. C.Z. then confirmed the events of January 1, 2019, and confirmed he and his sisters left because they were afraid of mother. Mother screamed at C.Z. not to lie, but C.Z. said he was telling the truth. Mother again insisted this was the product of coaching from father. Throughout, mother focused on how everything was about father not wanting to pay child support.

On April 3, 2019, father informed the social worker he couldn't get K.Z. and F.Z. mental health services because mother refused to provide medical cards for the children.

On April 8, 2019, the department filed a petition under section 300, subdivision (b)(1), as to all four children. The petition alleged mother suffered from unresolved mental health issues "resulting in [her] administering inappropriate discipline

6

to the children," and that she "failed to benefit from psychotropic medication." It also alleged mother had substance abuse problems with marijuana and methamphetamine. As to father, the petition alleged he had a child welfare history involving substantiated allegations of physical abuse and neglect and had an extensive criminal history.[2]

On April 9, 2019, the trial court found the petition made a prima facie showing that all four children fell within section 300. The court detained the children with their fathers. It also ordered supervised visitation between mother and the children a minimum of two times per week. The same day, the social worker spoke to mother to schedule an interview. Mother accused the department of reporting lies, then ignored the social worker while talking to other people around her.

On April 10, 2019, the social worker visited C.Z. at school unannounced, and interviewed him in private. C.Z. said that since the last time he spoke to the social worker, mother had thrown a metal toy car at him and bruised his leg. The social worker took a picture of the bruise. C.Z. said he didn't feel safe at mother's home because everything makes her upset, and when she gets upset she throws things at him. C.Z. said he loved mother but was afraid of her, and he wanted her to get help for her anger and drug use.

On April 16, 2019, the social worker again attempted to schedule an interview with mother. She yelled, cursed, threatened the social worker's job, and accused the

---

[2] We discuss allegations about K.R. only where relevant to his siblings' cases, because he and his father are not parties to this appeal.

7

social worker of discriminating against her. She then refused to speak to the social worker.

On April 18, 2019, K.Z. and F.Z. told the social worker they didn't want to visit mother. The social worker encouraged them to go through with the visit, and they agreed as long as the social worker was present the entire time.

On April 19, 2019, mother visited with all four children at the department's offices. A Special Investigative Unit (SIU) officer was present because of mother's aggressive conduct towards the social worker. Mother arrived 20 minutes late and began the visit by yelling at the SIU officer and social worker. She talked to the three eldest children and told them what schools they were and were not allowed to attend. If the children disagreed with her opinion, she yelled at them. She had to be re-directed to focus on spending time with her children.

The same day, father informed the social worker he had changed the children's cell phone numbers. He said mother had sent a text message to K.Z. threatening to harm herself, and K.Z. called 911. Eventually, he provided screenshots of the message to the social worker, which contained a clear suicide threat.

On April 22, 2019, mother failed to show for her scheduled visit. The social worker took the opportunity to interview the children. During these interviews the children again confirmed the allegations in the petition. In particular, the children confirmed mother's drug use. K.Z. said " 'every time she comes out of the bathroom or her room it's smoky and while she is in the bathroom I can hear . . . the lighter

8

clicking.' " F.Z. said she never saw mother use drugs " 'but I've seen like the pipes and bags. We would walk into her room and restroom and it would be smoky.' " F.Z. said she couldn't identify what kind of drugs she believed mother smoked, because though she knew what marijuana smelled like she didn't know what methamphetamine smelled like and mother always used candles or spray to mask the smell anyway. C.Z. said mother yelled at him a lot and smoked marijuana and other drugs he couldn't identify. C.Z. said he only saw her smoking once. That time, he walked in on her with a long pipe in her mouth with a lighter underneath. She tried to hide the pipe when he came into the room.

Mother attended a scheduled visit on April 25, 2019. She said she didn't want to see or speak to the social worker but wasn't otherwise negative or aggressive. She wore dark sunglasses while inside and for the majority of the visit. When she took them off the social worker saw she had a black eye. Her feet also appeared to be swollen and her shoes didn't fit on her feet. At some point, K.R.'s father entered the room despite being told the visit was for mother only. He objected aggressively and mother joined in, yelling, screaming, and cursing at the visitation monitor while K.R. was present. K.R. appeared unbothered, and the department noted this could indicate "these types of confrontations are 'normal' for him to witness."

The next day, mother appeared for another visit. She brought clothing for the children. However, when it came time for them to leave, mother refused to give them their belongings. She yelled at, cursed at, and threatened to physically harm the department staff. She also held on to F.Z. and K.Z., refusing to let them go. SIU officers

intervened and she eventually let go. However, when mother got to the parking lot she began threatening father and wouldn't let K.Z. and F.Z. get into his car. SIU officers intervened again to get the children into the car. The department staff asked father to pull around back to pick up C.Z., who was still in the office. When he did, mother and K.R.'s father pulled their car around to block father from leaving. Mother then got out of her car, opened the door of father's car, and started trying to pull C.Z. out of the car. C.Z. begged her to stop. SIU officers intervened again, but mother refused to let go of C.Z. while threatening him. SIU officers were eventually able to get mother to let go, and father reversed into a secured lot where he waited while SIU officers made sure mother left the area.

After this visit, the department noted that mother yelled and threatened at every visit, "refuse[d] to submit to oral drug tests," and "displayed erratic behavior . . . during the visits, in that she yells and taunts the youth. When prompted to change the subject, she begins to do the same to staff. This has left the youth feeling like they have to try to intervene and deescalate the situation by pleading with [mother]. After [the April 26] incident, the [oldest three children] indicated to their father that they were 'really scared.' "

At the May 6, 2019, jurisdiction/disposition hearing, the department requested the court suspend all in-person visitation between mother and her children as well as require both random and on-demand drug testing. The children's attorney told the court the children "would very much like to remain in her life and see her as much as possible."

The children said they were in favor of Skype visits. After argument, the court suspended all in-person visitation but allowed monitored Skype visits once a week and also required mother to undergo random or on-demand drug testing. The court ordered mother to sign a release of information form. When the social worker presented mother with the forms, she became verbally aggressive and pushed father. Her attorney tried to get her to sign the forms, but she would not do it.

Later that day, the social worker received a copy of a text message mother sent over "google hangouts" to one of the children. The message said, "I will never forgive you for this," "I hate you," accused the child of hating her, and implied she would refuse to participate in Skype visits.

On May 22, 2019, the court granted temporary restraining orders protecting father, K.Z., F.Z., C.Z., and K.R. from mother. The court later made this restraining order good for three years.

On May 23, 2019, the social worker received confirmation mother was in a mental health program and had medication for her mental health issues. Mother did not show for three consecutive drug tests, two random and one on-demand, between May 28 and June 10. However, on June 17, the social worker confirmed she had appeared for her initial appointment with the mental health program and saw a therapist. She also attended an appointment on June 13 and had another appointment for June 24. She missed another random drug test on June 17.

On June 24, the social worker received a mental health assessment from the mental health program diagnosing mother with bipolar I disorder.

On July 2, the social worker learned mother was attending regular appointments and was "medication compliant." The same day, the social worker received an email stating mother did not complete her parenting class. The parenting class teacher said mother did well during her time in the class. However, the teacher informed the social worker that to complete the class she would have to resume classes the next day, and the course would take another eight weeks.

Mother attended virtual visits with the children on June 13, 17, and 27. There were no concerns with any of these visits. According to the social worker mother "displayed control, calmness and no aggressive demeanor" and "has been appropriate with the children and appears to be doing well managing her mood during the visitations."

In a July 9 Addendum Report, the social worker stated mother "appears to be making progress with regards to her case plan services, except for the drug testing and substance abuse treatment. [Mother] has no showed for random and on demand drug testing . . . . In addition, she has failed to enroll in substance abuse treatment," despite being referred to such treatment on April 12. The report said father "has taken on the task of being a single father and handled it well. [He] has ensured the youth are safe and has attended to all of their needs. In addition, he has gotten them enrolled in school . . . ensures the youth attend all medical and therapy appointments as required," and "has gone above and beyond what the Department has requested of him by

12

transporting the youth to weekly visitations, and ensuring the youth are enrolled in extracurricular activities."

The department ultimately recommended father's name be stricken from the amended section 300, subdivision (b)(4) allegation that "[m]other and [father] have a history with [the department]," and to entirely strike the subdivision (b)(5) allegation that father has an extensive criminal history. It also recommended the court terminate the dependency as to the children and grant father sole legal and physical custody.

On July 15, 2019, the juvenile court held a contested jurisdiction hearing. Mother submitted on the petition as modified. The court amended the petition as the department had recommended and the parties had agreed, striking father's name from the (b)(4) allegation and striking the (b)(5) allegation entirely. The court then found the allegations in the newly amended petition true. Mother argued termination was premature, as the evidence indicated she had taken care of the issues affecting her parenting and her children's safety. She requested conjoint counseling with her children, co-parenting classes for her and father, and enough time to progress to unsupervised visits.

The juvenile court decided to terminate dependency as to the children, granted father full legal and physical custody, and entered a visitation order for mother. The court maintained jurisdiction as to K.R., and ordered that mother receive continued reunification services in his case.

II

ANALYSIS

Mother argues the juvenile court erred by terminating dependency jurisdiction prematurely. "We . . . review the juvenile court's decision to terminate dependency jurisdiction and to issue a custody (or 'exit') order pursuant to section 362.4 for abuse of discretion [citation] and may not disturb the order unless the court ' " 'exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].' " ' " (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) Custody and visitation orders are reviewed under the same standard. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) This standard requires us to " 'consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child. [Citation.] We are required to uphold the ruling if it is correct on any basis, regardless of whether it is the ground relied upon by the trial judge. [Citation.]' " (*Ibid.*)

If a court orders removal of a child from a custodial parent, the court must determine whether there is another parent who desires custody and must place the child with that parent unless such a placement would be contrary to the child's interests. (§ 361.2, subd. (a).) If the court chooses to place the child with the noncustodial parent, it has three options: "(1) order that the parent become legal and physical custodian of the child; (2) order that the parent assume custody subject to the jurisdiction of the juvenile

14

court and require that a home visit be conducted within three months; or (3) order that the parent assume custody subject to the supervision of the juvenile court." (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461.) If it chooses the first option, it must "terminate its jurisdiction over the child." (§ 361.2, subd. (b)(1).)

"When the juvenile court terminates its jurisdiction over a dependent child, section 362.4 authorizes it to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court." (*In re Roger S.* (1992) 4 Cal.App.4th 25, 30.) "When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) Though family court and juvenile courts "focus on the best interests of the child, '[t]he presumption of parental fitness that underlies custody law in the family court . . . does not apply to dependency cases' decided in the juvenile court." (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.) Therefore, "[t]he juvenile court has a special responsibility to the child . . . and must look to the totality of a child's circumstances when making decisions regarding the child." (*Ibid.*) Ultimately, though, "[t]he concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.)

15

Given these standards, we conclude the trial court did not abuse its discretion by terminating jurisdiction, granting father full legal and physical custody, and setting a visitation schedule for mother and her three oldest children. Throughout the seven-month period from the January 1, 2019 incident to the termination of dependency, mother consistently refused to cooperate with the department or address the issues which gave rise to their involvement. Indeed, mother initially refused to participate in any services. Though she eventually consistently attended mental health services, she failed to get any help for her substance abuse problems and missed every random or on-demand drug test required of her. There is thus ample evidence to conclude that, though Mother was addressing some of the problems that led to the department's petition, she was not addressing all of them, and in some cases made no attempt to do so.

All three children were also old enough to express their feelings about a custody arrangement and consistently said they preferred to live with father and did not feel safe with mother. K.Z. and F.Z. left her home on January 1, 2019, and never returned because they were afraid of her. Indeed, K.Z. and F.Z. also initially refused to even visit her, and only relented when the social worker promised to be present. Throughout the life of the dependency proceedings, K.Z. and F.Z. expressed fear at the prospect they would be forced to return to mother's custody. Though C.Z. returned to mother at some point, it's not clear this was his choice. He also told the social worker he was afraid of mother and didn't feel safe with her.

16

These fears were well founded. C.Z. reported multiple incidents where mother became aggressive or violent towards him even after the department became involved. The social worker herself witnessed mother's aggression towards C.Z., accusing him of lying during an interview. Indeed, mother was frequently aggressive during visits with her children—yelling, screaming, and cursing at staff both with and without her children present. This culminated in the April 26, 2018 incident, where mother physically attacked K.Z. and F.Z., had to be separated from them, attacked them again, physically blocked father and the children from leaving, and finally attacked C.Z. This incident led the court to suspend all in-person visitation. Mother's behavior only seemed to improve once she no longer had the opportunity to physically threaten her children.

By contrast, father took to "the task of being a single father and handled it well." He met the children's needs and cooperated fully with the department. Indeed, the department specifically highlighted that father went above and beyond what they expected of him by transporting the children to visitation and making sure they were involved in extracurricular activities. The children consistently expressed a preference for living with him, at least in part because they felt safer with him. Nothing in the record indicates he was anything but a capable and caring parent. Given mother's issues and general reluctance to address them versus father's exemplary performance as the custodial parent, placing the children with father permanently was not an abuse of discretion. That is, the court's decision to place the children with father permanently was not arbitrary, capricious, or patently absurd.

17

Mother does not attempt to downplay her poor behavior, but argues the record shows she was improving. She says this indicated the court's decision to terminate the dependency was premature. She argues the court should have instead ordered continued reunification services to allow her and her children to benefit from her improvements. She also argues she and father have an acrimonious relationship, which means terminating jurisdiction may allow him to flout the court's ordered visitation and force her to bear the costs of enforcing it. Finally, she argues the juvenile court should have ordered co-parenting classes for her and father.

While we acknowledge mother did not act poorly towards her children after early May 2019, as of July she had still not even attempted to address several of the central issues that caused the court to take jurisdiction over her children. As noted above, the only consistent service she participated in was mental health care. She was inconsistent in taking her parenting classes and made absolutely no attempt to address her substance abuse issues. Though it does appear she was improving, the juvenile court was well within its power to conclude she was not improving quickly enough, and that terminating jurisdiction and giving father full custody was in the best interest of the children. Moreover, mother is still receiving reunification services and is still being monitored by the department, because K.R. remained under the juvenile court's jurisdiction. Therefore, to the extent she does improve from these services, she may seek to modify the juvenile court's order in family court.

18

There is also no evidence to support mother's claim that father is unlikely to abide by the juvenile court's visitation order. As noted above, the department specifically highlighted that father went above and beyond in making sure the children made scheduled visits, transporting them there himself. There is nothing in the record to indicate father ever failed to produce the children for visits or obstructed mother's court-ordered visitation. While it is always possible father will suddenly start ignoring visitation orders once he is no longer under active scrutiny, "[w]e cannot interfere with the juvenile court's ruling based on speculation about what 'may' happen." (*In re Jose C.* (2010) 188 Cal.App.4th 147, 159.)

Nor is there any evidence father failed to effectively co-parent to the extent possible and necessary. While we don't doubt there is animosity between father and mother, the record simply doesn't contain any evidence this animosity caused father to behave contrary to the children's best interest. Indeed, mother was the source of all the co-parenting issues. Small examples of this include her lack of cooperation in getting the children enrolled in school or providing information so they could receive mental health services. Major examples include mother threatening father and trying to physically prevent him from taking the children home, among other things. Though we do not doubt better co-parenting would aid the children, it seems any failures on this front are mother's and mother's alone. The court therefore did not abuse its discretion in declining to require father and mother participate in co-parenting classes before terminating jurisdiction.

Because the court did not abuse its discretion in deciding not to continue or expand reunification services and to terminate jurisdiction, we affirm.

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH _____
J.

We concur:

RAMIREZ _____
P. J.

McKINSTER _____
J.